FILED
CLERK, U.S. DISTRICT COURT

DEC 8 2023

CENTRAL DISTRICT OF CALIFORNIA
BY: ___MG___ DEPUTY

1  John R. Parker, Jr,
   California Bar No. 257761
2  **ALMEIDA LAW GROUP LLC**
   3550 Watt Avenue, Suite 140
3  Sacramento, California 95821
   Tel: (916) 616-2936
4  jrparker@almeidalawgroup.com

5
   *[Additional counsel listed on signature page]*
6

7  **Attorneys for Plaintiffs & the Proposed Class**

8           **UNITED STATES DISTRICT COURT**
9        **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

10 **R.C. and T.S.,** *individually and on*          CASE NO. 5:23-cv-01933-JGB-SP
11 *behalf of all others similarly situated,*
                                                    **CLASS ACTION COMPLAINT**
12          Plaintiffs,                              **FOR:**

13          v.                                       **1. COMMON LAW INVASION OF**
                                                     **PRIVACY – INTRUSION UPON**
14 **WALGREEN CO. d/b/a**                            **SECLUSION**
15 **WALGREENS**, an Illinois                        **2. NEGLIGENCE**
                                                     **3. UNJUST ENRICHMENT**
16 Corporation,                                      **4. VIOLATIONS OF**
                                                     **ELECTRONIC**
17          Defendant.                               **COMMUNICATIONS PRIVACY**
                                                     **ACT, 18 U.S.C. § 2511(1),** *et seq.*
18                                                   **5. VIOLATION OF CALIFORNIA**
19                                                   **INVASION OF PRIVACY ACT,**
                                                     **Cal. Penal Code §§ 630,** *et. seq.*
20                                                   **6. VIOLATION OF CALIFORNIA**
21                                                   **UNFAIR COMPETITION LAW,**
                                                     **Cal. Bus. & Prof. Code § 17200,** *et*
22                                                   *seq.* **– Unlawful & Fraudulent**
23                                                   **Business Practices**
                                                     **7. VIOLATION OF CALIFORNIA**
24                                                   **UNFAIR COMPETITION LAW,**
25                                                   **Cal. Bus. & Prof. Code § 17200,** *et*
                                                     *seq.* **-   Unfair Business Practices**
26                                                   **8. VIOLATION OF CALIFORNIA**
27                                                   **CONSUMERS LEGAL REMEDIES**
28

1

**ACT, Cal. Civ. Code § 1750, *et seq.***
**9. VIOLATION OF VIRGINIA**
**CONSUMER PROTECTION ACT,**
**Va. Code. Ann. §§ 159.1-196, *et seq.***

**DEMAND FOR JURY TRIAL**

### SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs R.C. and T.S. ("Plaintiffs"), on behalf of themselves and all others similarly situated, by and through their counsel of record, bring this class action lawsuit against Walgreen Co. d/b/a Walgreens ("Walgreens" or "Defendant"). The allegations set forth in this class action complaint are based on Plaintiffs' personal knowledge, due investigation of undersigned counsel and—where indicated—upon information and good faith belief.

### INTRODUCTION

1.      Plaintiffs bring this class action lawsuit to address Walgreens' transmission and disclosure of Plaintiffs' and Class Members' ("Users") personally identifiable information ("PII") and protected health information ("PHI") (collectively referred to as "Private Information") to Meta Platforms, Inc. d/b/a Meta ("Meta" or "Facebook"), Pinterest, Inc. ("Pinterest"), and other third parties via tracking pixels ("Tracking Pixel" or "Pixel") and other tracking technologies installed on Defendant's website, www.walgreens.com (the "Website" or the "Digital Platforms").

2.      This case concerns a very serious breach of Walgreens' data privacy and security obligations as it installed these tracking technologies on its Digital Platforms to collect and to disclose to unauthorized third parties Plaintiffs' and Class Members' Private Information solely for its own pecuniary gain.

3.      Information concerning a person's physical and mental health is among the most confidential and sensitive information in our society and the mishandling of such information can have serious consequences including, but certainly not

2

limited to, discrimination in the workplace and/or denial of insurance coverage.[1]

4.      Simply put, if people do not trust that their sensitive private information will be kept private and secure, they may be less likely to seek medical treatment which can lead to much more serious health consequences down the road. In addition, protecting medical information and making sure it is kept confidential and not disclosed to unauthorized entities is vitally necessary to maintain public trust in the healthcare system as a whole.

5.      Reiterating the importance of and necessity for data security and privacy concerning health information, the Federal Trade Commission ("FTC") recently published a bulletin entitled *Protecting the privacy of health information: A Baker's dozen takeaways from FTC cases*, in which it noted that "[h]ealth information is not just about medications, procedures, and diagnoses. ***Rather, it is anything that conveys information—or enables an inference—about a consumer's health***. Indeed, [recent FTC enforcement actions involving] *Premom*, *BetterHelp*, *GoodRx* and *Flo Health* **make clear that the fact that a consumer is using a particular health-related app or website—one related to mental health or fertility, for example—or how they interact with that app (say,**

---

[1] *See* Lindsey Ellefson, *Telehealth Sites Put Addiction Patient Data at Risk: New research found pervasive use of tracking tech on substance-abuse-focused health care websites, potentially endangering users in a post-Roe world*, WIRED (Nov. 16, 2022), available at https://www.wired.com/story/substance-abuse-telehealth-privacy-tracking-tech/ (last visited Nov. 25, 2023) ("While the sharing of any kind of patient information is often strictly regulated or outright forbidden, it's even more verboten in addiction treatment, as patients' medical history can be inherently criminal and stigmatized."); *see also* Todd Feathers, Simon Fondrie-Teitler, Angie Waller & Surya Mattu, *Facebook Is Receiving Sensitive Medical Information from Hospital Websites*, THE MARKUP (June 16, 2022), available at https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites (last visited Nov. 25, 2023).

1    *turning 'pregnancy mode' on or off) may itself be health information."[2]*

2    6.    The FTC is unequivocal in its stance as it informs—in no uncertain

3    terms—healthcare companies that they should ***not*** use tracking technologies to

4    collect sensitive health information and disclose it to various platforms without

5    informed consent:

> ***Don't use behind-the-scenes tracking technologies***
> ***that contradict your privacy promises or otherwise***
> ***harm consumers.***
>
> In today's surveillance economy, the consumer is often
> the product. Consumer data powers the advertising
> machine that goes right back to the consumer. ***But when***
> ***companies use consumers' sensitive health data for***
> ***marketing and advertising purposes, such as by***
> ***sending that data to marketing firms via tracking pixels***
> ***on websites or software development kits on apps,***
> ***watch out.***
>
> [Recent    FTC    enforcement    actions    such    as]
> *BetterHelp*, *GoodRx*, *Premom*, and *Flo* make clear that
> practices like that ***may run afoul of the FTC Act if they***
> ***violate privacy promises or if the company fails to get***
> ***consumers' affirmative express consent for the***
> ***disclosure of sensitive health information***.[3]

7    7.    Unbeknownst to its Users and without Users' authorization or informed

consent, in order to gain additional insights into its customers, improve its return on

---

[2] *See* Elisa Jillison, *Protecting the privacy of health information: A Baker's dozen takeaways from FTC cases,* the FTC Business Blog (July 25, 2023) (emphasis added), available at https://www.ftc.gov/business-guidance/blog/2023/07/protecting-privacy-health-information-bakers-dozen-takeaways-ftc-cases (last visited Nov. 25, 2023).

[3] *Id.* (emphasis added) (further noting that *GoodRx* & *Premom* underscore that this conduct may also violate the Health Breach Notification Rule, which requires notification to consumers, the FTC and, in some cases, the media, of disclosures of health information without consumers' authorization.

4

its marketing dollars and, ultimately, to increase its revenue, Walgreens encouraged Plaintiffs and Class members to access and to use various digital tools via its Digital Properties, in order to, among other things, receive healthcare services.

8.    Plaintiffs and Class Members reasonably expected that their healthcare-related communications with Defendant via its Digital Platforms were confidential, solely between themselves and Walgreens and that such communications would not be transmitted to or intercepted by a third party. Plaintiffs and Class Members would not have provided their sensitive Private Information to Walgreens had they known that Defendant would disclose it to unauthorized third parties.

9.    Plaintiffs' and Class Members' Private Information has value—both to Plaintiffs and Class Members and to third parties—and, companies like Facebook utilize the precise type of information disclosed by Defendant to identify, target, and market products and services to individuals.

10.    Defendant and other companies collecting such Private Information also use it for retargeting, a form of online marketing that targets users with ads based on their previous Internet communications and interactions.

11.    The conduct alleged in this suit includes Walgreens sending to Facebook—without any consent whatsoever—the name of a highly sensitive healthcare product that revealed that Plaintiff R.C. had a vaginal yeast infection—simply because Plaintiff placed the product in her shopping cart on Defendant's Website.

12.    Walgreens did the same thing for Plaintiff T.S. and millions of other customers who placed sensitive healthcare products in their virtual shopping carts on the Website, including Plan B, HIV tests, pregnancy tests, prenatal vitamins, hyperglycemic/hypoglycemic management products, and numerous other products to diagnose and/or treat highly sensitive and private conditions, to Facebook, all without its customers' knowledge and/or consent.

13.    Information about a person's physical and mental health is among the

5

most confidential and sensitive information in our society and the mishandling of such information can have serious consequences including, but certainly not limited to, embarrassment, discrimination in the workplace and denial of insurance coverage.

14.     Walgreens has a presence in in all fifty states, the District of Columbia, Puerto Rico and the U.S. Virgin Islands, and employs more than 200,000 people. In addition, Walgreens is one of the world's largest purchasers of prescription drugs and many other health and well-being products. The company's "expanded omnichannel capabilities provide customers with convenient access to consumer goods and services, including owned branded general merchandise, such as Walgreens Brand, Nice!, Finest Nutrition and Well Beginnings, as well as pharmacy and health and wellness services in communities across America."[4]

15.     During the Class Period, Walgreens operated one of the largest chains of pharmacies in the United States, marketing, selling and profiting from its delivery of health care services and retail products to approximately ten million Americans daily.[5]

16.     As of August 31, 2022, Defendant operated almost 9,000 retail drugstores in all fifty states, claiming, "approximately 78 percent of the U.S. population lives within five miles of a Walgreens, Duane Reade store."[6] Defendant also maintained and operated, and continues to maintain and operate, a website—https://www.walgreens.com—through which its customers can, among other things, learn about Defendant's services, find Walgreens stores, purchase healthcare supplies, book various medical tests, schedule a number of different vaccinations

---

[4] *See* U.S. Retail Pharmacy Segment, https://www.walgreensbootsalliance.com/our-business/us-retail-pharmacy-segment (last visited Nov. 17, 2023).

[5] *See* Walgreens' Facts & FAQs (2023), https://news.walgreens.com/press-center/frequently-asked-questions/.

[6] *Id.*

and otherwise interact with Defendant.[7]

17.    Walgreens acknowledges the need for rapid development of its digital platform. For example, Walgreens' parent company, Walgreens Boots Alliance, states in its 2022 Annual Report that:

> The portion of total consumer expenditures with retailers occurring online and through mobile applications has continued to increase and has accelerated significantly during COVID-19. The pace of this increase could further accelerate in the future. Our business has evolved from an in-store experience to interaction with customers across numerous channels, including in-store, online, mobile and social media, among others. **Omni-channel and differentiated retail models are rapidly evolving and we must keep pace with changing customer expectations and new developments by our competitors.**
>
> We must compete by offering a consistent and convenient shopping experience for our customers regardless of the ultimate sales channel and by investing in, providing and maintaining digital tools for our customers. If we are unable to make, improve, or develop relevant customer facing technology in a timely manner that keeps pace with technological developments and dynamic customer expectations, **our ability to compete** and our results of operations could be materially and adversely affected. **In addition, if our online activities or our other customer-facing technology systems do not function as designed, we may experience a loss of customer confidence, data security breaches, lost sales, or be exposed to fraudulent purchases, any of which could materially and adversely affect our business operations,**

---

[7] Walgreens Home Page, https://www.walgreens.com (last visited Nov. 13, 2023).

**reputation and results of operations**.[8]

18. What Walgreens has not publicly acknowledged is that customers would be unknowingly sacrificing their privacy by using Walgreens' Website. That is, Walgreens made the conscious and intentional decision to put its profits over the privacy of its Users, which number several million. Specifically, Walgreens installed certain tracking technologies on its Website in order to intercept and to send Private Information to third parties without its Users' consent.

19. The Private Information illegally sent to these third parties is, in turn, associated with other information to create very fulsome user profiles that are mined for marketing and other commercial purposes. For example, in the case of information sent by Walgreens to Facebook, such information was then linked to Plaintiffs' unique Facebook user ID ("Facebook ID" or "FID") and other unique personal identifiers such as the customer's personal internet protocol ("IP") address, so that there was no anonymity in that Facebook and/or any third parties who were able to access the information would be able to associate such personal health data with Plaintiffs and all Class Members.

20. When Plaintiffs and other customers used Defendant's Website in order to search for and to obtain healthcare products, unbeknownst to them, the names of their sensitive healthcare products, including, depending on the customer, Plan B, HIV tests, pregnancy tests, prenatal vitamins, hyperglycemic/hypoglycemic management products and numerous other products to diagnose and/or treat highly sensitive and private conditions, along with their personal information and personal identifiers, were secretly disclosed to Facebook, an unauthorized third party.

21. Through the Meta Pixel, a tracking tool intentionally incorporated by

---

[8] *See* Walgreens Boots Alliance, Inc., *Fiscal 2022 Annual Report, Form 10-K*, p. 22 (2022) (https://s1.q4cdn.com/343380161/files/doc_financials/2022/ar/WBA-2022-Annual-Report.pdf) (emphasis added).

Walgreens in its Website source code or otherwise affirmatively permitted on its website by Walgreens, for customers who used the Website to obtain healthcare products, including Plaintiffs, Defendant disclosed individually identifying information and information regarding their sensitive healthcare products, including Plan B, HIV tests, pregnancy tests, prenatal vitamins, hyperglycemic/hypoglycemic management products and numerous other products to diagnose and/or treat highly sensitive and private conditions, to Facebook, all without its customers' knowledge and/or consent.

22.    Thus, through its actions and practices, Walgreens has disclosed Private Information to Facebook. And Facebook has in turn viewed Plaintiffs' and Class Members' Private Informaton.This massive breach of confidentiality and privacy has, on information and belief, affected millions of Walgreens customers in the State of California as well as millions more nationwide.

23.    As detailed herein, Walgreens' privacy policies, both current and over the Class period, provided no warning whatsoever that Class Members' PHI or other sensitive health information would be disclosed to Facebook for marketing purposes or otherwise. Rather, the applicable privacy policies stated that written authorization must be obtained from customers before their PHI is used or disclosed for marketing purposes.

24.    Walgreens *never* obtained such authorizations from Plaintiffs or the Class Members.

25.    At all times relevant to this action, Plaintiffs and Class Members had no informed consent that information about their sensitive health conditions would be transmitted to the largest social media company on earth.

26.    Despite Defendant's representations and material omissions—as well as many other similar ones in its privacy policies and elsewhere—that sensitive user data regarding Plaintiffs' and Class Members' health conditions is not shared without consent—through its actions, Walgreens has acknowledged that it used

9

invisible trackers by Facebook on its Digital Platforms.

27.    For example, in June 30, 2023, Walgreens was named in an article by *The Markup* regarding its use of the Meta Pixel to send Facebook highly sensitive health information that Walgreens collected from customers seeking sensitive healthcare products including Plan B and HIV tests.[9]

28.    Upon information and good faith belief, Walgreens had shared the sensitive healthcare information of millions of clients with an unauthorized third party, including Facebook, for years prior to the release of *The Markup*'s article.

29.    Despite the stigmas that unfortunately are so often associated with various medical issues and treatments, Walgreens intentionally chose to put its profits over the privacy of its customers, which likely number in the tens of millions in California alone.

30.    The disclosure of Plaintiffs' and Class Members' Private Information via the Pixel contravenes the letter and spirit of HIPAA's "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") which governs how health care providers must safeguard and protect Private Information.[10] The Privacy Rule is applicable to covered entities, which includes pharmacies that send PHI electronically, which includes all modern retail pharmacies such as Defendant.

31.    The HIPAA Privacy Rule sets forth policies to protect all Individually Identifiable Health Information ("IIHI") that is held or transmitted by a covered entity such as Walgreens. These are the 18 HIPAA Identifiers that are considered personally identifiable information because this information can be used to identify, contact, or locate a specific person or can be used with other sources (such as a

---

[9] *See* https://themarkup.org/pixel-hunt/2023/06/30/need-to-get-plan-b-or-an-hiv-test-online-facebook-may-know-about-it (last accessed Nov. 13, 2023)

[10] The HIPAA Privacy Rule, https://www.hhs.gov/hipaa/for-professionals/privacy/index.html  (last visited Nov. 13, 2023).

person's Facebook account) to identify a single individual. When IIHI is used in conjunction with one's physical or mental health or condition, health care, and/or one's payment for that health care, it becomes PHI.[11]

32.    While healthcare entities regulated under HIPAA may use third-party tracking tools, such as Google Analytics or Meta Pixel, they can do so only in a very limited way, to perform analysis on data key to operations. They are not permitted, however, to use these tools in a way that may expose patients' PHI to these vendors.[12]

33.    Simply put, further to the HIPAA Privacy Rule, covered entities such as Defendant are simply ***not*** permitted to use tracking technology tools (like pixels) in a way that exposes patients' Private Information to any third party without express and informed consent.

34.    Lest there be any doubt of the illegal nature of Defendant's practice, the Office for Civil Rights (OCR) at HHS has made clear, in a recent bulletin entitled *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, that the unlawful transmission of such protected information violates HIPAA's Privacy Rule:

> Regulated entities [those to which HIPAA applies] are not

---

[11]    *Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html, (last visited Nov. 13, 2023) (HIPAA Identifiers include name; address (all geographic subdivisions smaller than state, including street address, city county, and zip code); all elements (except years) of dates related to an individual (including birthdate, admission date, discharge date, date of death, and exact age); telephone numbers; email address; medical record number; health plan beneficiary number; account number; device identifiers and serial numbers; web URL; internet protocol (IP) address; and any other characteristic that could uniquely identify the individual).

[12] *See id.*

SECOND AMENDED CLASS ACTION COMPLAINT                    CASE NO. 5:23-cv-01933-JGB-SP

permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. *For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.*[13]

35.    Moreover, Defendant breached its statutory and common law obligations to Plaintiffs and Class Members by, *inter alia*: (i) failing to adequately review its marketing programs and web based technology to ensure its Digital Platforms were safe and secure; (ii) failing to remove or disengage technology that was known and designed to share web-users' information; (iii) failing to obtain the written consent of Plaintiffs and Class Members to disclose their Private Information to Facebook or others; (iv) failing to take steps to block the transmission of Plaintiffs' and Class Members' Private Information through Pixels; (v) failing to warn Plaintiffs and Class Members that their Private Information was being shared with third parties without express consent; and (vi) otherwise failing to design, and monitor its Digital Platforms to maintain the confidentiality and integrity of patient Private Information.

36.    Defendant's actions constitute an extreme invasion of Plaintiffs' and Class Members' privacy. Defendant's actions also violated common law, the California Constitution, and numerous federal and state statutes. As a result, Plaintiffs and Class Members have suffered numerous injuries, including: (i) invasion of privacy; (ii) loss of benefit of the bargain; (iii) diminution of value of the Private Information; (iv) statutory damages and (v) the continued and ongoing risk

---

[13]    *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates,* available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (emphasis added) (last visited Nov. 13, 2023).

to their Private Information.

37.    Plaintiff R.C. brings this class action on behalf of herself and all natural persons residing in California who used Defendant's Website to purchase sensitive healthcare products including Plan B, HIV tests, pregnancy tests, prenatal vitamins, hyperglycemic/hypoglycemic management products and numerous other products to diagnose and/or treat highly sensitive and private conditions and whose Private Information was disclosed or transmitted to Meta or any other unauthorized third party (hereinafter, "California Subclass Members").

38.    Plaintiff T.S. brings this class action on behalf of herself and all natural persons residing in Virginia who used Defendant's Website to purchase sensitive healthcare products including Plan B, HIV tests, pregnancy tests, prenatal vitamins, hyperglycemic/hypoglycemic management products and numerous other products to diagnose and/or treat highly sensitive and private conditions and whose Private Information was disclosed or transmitted to Meta or any other unauthorized third party (hereinafter, "Virginia Subclass Members").

39.    Plaintiffs also bring this class action on behalf of themselves and all natural persons who used Defendant/s Website to purchase healthcare products and whose Private Information was disclosed or transmitted to Meta or any other unauthorized third party (hereinafter, "Nationwide Class Members" and, collectively with California Subclass Members and Virginia Subclass Members, hereinafter "Class Members").

## **PARTIES**

40.    Plaintiff R.C. is a citizen of California residing in Palm Desert, Riverside County, California, where she intends to remain indefinitely. Plaintiff R.C. used Defendant's Website to purchase sensitive healthcare products including Monistat, within the past year. As a result, her Private Information was disclosed to

Meta without her knowledge, consent or authorization.

41.    Plaintiff T.S. is a citizen of Virginia residing in Midlothian, Chesterfield County, Virginia, where she intends to remain indefinitely. Plaintiff T.S. used Defendant's Website to purchase sensitive healthcare products including a test kit for diabetes, within the past year. As a result, her Private Information was disclosed to Meta without her knowledge, consent or authorization.

42.    Defendant Walgreen Co. is an Illinois Corporation, headquartered in Illinois at 108 Wilmot Road in Deerfield, Illinois 60015. Defendant Walgreen Co. does business as Walgreens throughout the United States, as well as through several global health and beauty product brands. According to the Illinois Secretary of State, Defendant's Registered Agent is Illinois Corporation Service Company, 801 Adlai Stevenson Drive, in Springfield, Illinois 62703.

## JURISDICTION & VENUE

43.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d) and the Class Action Fairness Act of 2005 ("CAFA") because the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and minimal diversity exists because at least one class member and Defendant are citizens of different states.

44.    With respect to diversity jurisdiction under CAFA, in determining whether the amount in controversy exceeds $5,000,000, the claims of the individual Class Members are aggregated. 28 U.S.C. § 1332(d)(6). Here, Plaintiffs assert 16 causes of action, including (1) CIPA, Cal. Penal Code § 630, *et seq*.

45.    As described in the Prayer for Relief, Plaintiffs seek on behalf of themselves and the proposed class: damages, including statutory damages; punitive damages; injunctive relief; and attorneys' fees. CAFA's amount-in-controversy threshold is satisfied with Plaintiffs' prayer for statutory damages under CIPA alone.

CIPA authorizes damages of the greater of: (1) "five thousand dollars ($5,000) per violation" and (2) "three times the amount of actual damages, if any, sustained by the Plaintiffs" for "[a]ny person who has been injured by a violation" of the statute. Cal. Penal Code § 637.2.

46.    Plaintiffs allege they believe the size of the proposed class to be in the millions.

47.    Plaintiffs further assert that each proposed class member's use of the Website to add sensitive health products to their Website shopping cart constitutes a discrete CIPA violation, alleging that Defendant's conduct constitutes numerous independent and discrete violations of Cal. Penal Code § 631(a). Thus, Plaintiffs' alleged statutory damages alone place the amount in controversy well over $5,000,000, thereby satisfying CAFA's jurisdictional threshold.

48.    Plaintiffs' other claims and requests for relief also substantially increase the already-satisfied amount in controversy. For instance, Plaintiffs seek injunctive relief under, *inter alia*, Cal. Penal Code § 631(a), as well as attorneys' fees. The value of such requested relief must also be included in determining the amount in controversy. *See, e.g., Fritsch v. Swift Transp. Co. of Ariz., LLC*, 899 F.3d 785, 794 (9th Cir. 2018) ("[A]ttorneys' fees are at stake in the litigation, and must be included in the amount in controversy."); *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 840 (9th Cir. 2002) (including requested injunctive relief in calculating amount in controversy). Therefore, Plaintiffs' allegations satisfy CAFA's $5,000,000 amount in controversy requirement, exclusive of interest and costs.

49.    This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this Complaint alleges violation of federal laws, including the Electronic Communications Privacy Act ("ECPA"), 28 U.S.C. § 2511, *et seq*.

50.    The Court has personal jurisdiction over Walgreens because it regularly engages in extensive business throughout the country and the State of California, including through its hundreds of drugstores in California.

51.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because many of the acts and/or omissions giving rise to the claims asserted herein occurred in this judicial district.

## FACTUAL BACKGROUND

**I.    IN ORDER FOR PLAINTIFFS & CLASS MEMBERS TO PURCHASE HEALTHCARE PRODUCTS ON ITS WEBSITE, DEFENDANT REQUIRED THEIR PRIVATE INFORMATION TO BE COLLECTED & STORED ON ITS WEBSITE.**

52.    Throughout the Class Period, Defendant maintained and operated a website (www.walgreens.com, or "Website"), by and through which Defendant encouraged and permitted consumers to seek healthcare products.

53.    To purchase sensitive healthcare products, Plaintiffs and other Class Members were required to search for and to add the healthcare products to their virtual cart before proceeding to checkout.

54.    On information and good faith belief, each step of this process was tracked and logged by the Meta Pixel.

55.    On information and good faith belief, throughout the Class Period, the process for purchasing healthcare products on the Website has been substantially the same in all material respects throughout the United States.

56.    Thus, in order to use the Website to purchase healthcare products, Plaintiffs and other Class Members were required by Defendant to disclose confidential, private, and sensitive personal and health information to Walgreens, and to have that information stored on Defendant's website servers along with their personal identifiers.

**II.    DEFENDANT SECRETLY DISCLOSED, & PERMITTED THIRD PARTIES TO INTERCEPT, PLAINTIFFS' & CLASS MEMBERS' PHI.**

57.    Completely unbeknownst to Plaintiffs and other Class Members, and continuing to the present, Private Information that they communicated to Defendant

16

through the Website while purchasing sensitive healthcare products was intercepted by and/or disclosed to at least four unauthorized third parties: Meta, Google, Bing and Pinterest.[14]

### A.    Defendant's Pixel, Source Code & Interception of HTTP Requests

58.    Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the Internet.  Each "client device" (such as computer, tablet, or smart phone) accesses web content through a web browser (e.g., Google's Chrome, Mozilla's Firefox, Apple's Safari, and Microsoft's Edge).

59.    Every website is hosted by a computer "server" that holds the website's contents and through which the entity in charge of the website exchanges communications with Internet users' client devices via web browsers.

60.    Web communications consist of HTTP Requests and HTTP Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

- **HTTP Request**: an electronic communication sent from the client device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (i.e., web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies.

- **Cookies**: a small text file that can be used to store information on the client device which can later be communicated to a server or servers.  Cookies are sent with HTTP Requests from client devices to the host server.  Some cookies are "third-party cookies" which means they can store and communicate data when visiting one website to an entirely different website.

- **HTTP Response**: an electronic communication that is sent as a reply to the client device's web browser from the host server

---

[14] *See supra* note 9.

17

in response to an HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data. [15]

61.    A customer's HTTP Request essentially asks the Website to retrieve certain information (such as sensitive healthcare products placed in the virtual shopping cart), and the HTTP Response renders or loads the requested information in the form of "Markup" (the pages, images, words, buttons, and other features that appear on the customer's screen as they navigate the Website).

62.    Every website is comprised of Markup and "Source Code." Source Code is a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

63.    Source code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user. The Pixel and other tracking technologies Walgreens uses constitute source code that does just that. These tracking technologies thus act much like a traditional wiretap.

64.    Walgreens encourages customers to use its Digital Platforms to purchase healthcare products and take other actions related to their personal health care. When interacting with Walgreens' Digital Platforms like this, Plaintiffs and Class Members convey highly private and sensitive information to Walgreens.

65.    When patients visit Walgreens' Digital Platforms via an HTTP Request to Walgreens' server, that server sends an HTTP Response including the Markup that displays the webpage visible to the user and Source Code, including Walgreens' Pixel.

[15]    One browsing session may consist of hundreds or thousands of individual HTTP Requests and HTTP Responses.

18

66.     Thus, Walgreens is in essence handing customers a tapped device, and once the webpage is loaded into the customer's browser, the software-based wiretap is quietly waiting for private communications on the Website to trigger the tap, which intercepts those communications intended only for Walgreens and transmits those communications to third parties, including Facebook, Google, TikTok, and others.

67.     Third parties, like Facebook and Google, place third-party cookies in the web browsers of users logged into their services. These cookies uniquely identify the user and are sent with each intercepted communication to ensure the third party can uniquely identify the customer associated with the Private Information intercepted.

68.     Defendant intentionally configured Pixels installed on its Website to capture both the "characteristics" of individual patients' communications with the Defendant's Websites (e.g., their IP addresses, Facebook ID, cookie identifiers, device identifiers and account numbers) and the "content" of these communications (i.e., the buttons, links, pages, and tabs they click and view, as well as search terms entered into free text boxes and descriptive URLs showing the information being exchanged).

69.     Defendant also deposits cookies named _fbp, _ga_, and _gid onto Plaintiffs' and Class Members' computing devices. These are cookies associated with the third-parties Facebook and Google but which Defendant deposits on Plaintiffs' and Class Members' computing devices by disguising them as first-party cookies.  Without any action or authorization, Defendant commands Plaintiffs' and Class Members' computing devices to contemporaneously re-direct the Plaintiffs' and Class Members' identifiers and the content of their communications to Facebook and Google.

70.     The fbp cookie is a Facebook identifier that is set by Facebook source code and associated with Defendant's use of the Facebook Tracking Pixel program.

19

The fbp cookie emanates from Defendant's web properties as a putative first party cookie, but is transmitted to Facebook through cookie synching technology that hacks around the same-origin policy. The __ga and _gid cookies operate similarly as to Google.

71.    Furthermore, if the Website visitor is also a Facebook user, the information Facebook receives is linked to the visitor's Facebook profile (via their Facebook ID or "c_user id"), which includes other identifying information.

72.    Thus, without any knowledge, authorization, or action by a user, a website owner like Walgreens can use its source code to commandeer a user's computing device, causing the device to contemporaneously and invisibly re-direct the users' communications to third parties.

73.    In this case, Walgreens employed just such devices (the Tracking Pixel, Google Tag Manager, and similar technologies) to intercept, duplicate, and re-direct Plaintiffs' and Class Members' Private Information to third parties like Facebook, Google, Bing and Pinterest.

74.    The Pixel, a marketing product, is a "piece of code" that allowed Defendant to "understand the effectiveness of [their] advertising and the actions [patients] take on [their] site."[16] It also allowed Defendant to optimize the delivery of ads, measure cross-device conversions, create custom advertising groups or "audiences," learn about the use of its Website, and decrease advertising and marketing costs.[17]

75.    Most importantly, it allowed Facebook to secretly intercept customers' communications about their purchases of sensitive healthcare products including Plan B, HIV tests, pregnancy tests, prenatal vitamins, hyperglycemic/hypoglycemic

---

[16] https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited Nov. 14, 2023).

[17] *Id.*

management products and numerous other products to diagnose and/or treat highly sensitive and private conditions on the Website.

### B.    Facebook's Platform & its Business Tools.

76.    Facebook operates the world's largest social media company and generated $117 billion in revenue in 2021, roughly 97% of which was derived from selling advertising space.[18]

77.    In conjunction with its advertising business, Facebook encourages and promotes entities and website owners, such as Defendant, to utilize its "Business Tools" to gather, identify, target and market products and services to individuals.

78.    Facebook's Business Tools, including the Pixel, are bits of code that advertisers can integrate into their webpages, mobile applications, and servers, thereby enabling the interception and collection of user activity on those platforms.

79.    The Business Tools are automatically configured to capture "Standard Events" such as when a user visits a particular webpage, that webpage's Universal Resource Locator ("URL"), metadata, button clicks, and other user interactions with a webpage.[19]

---

[18]    META REPORTS FOURTH QUARTER AND FULL YEAR 2021 RESULTS, https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx, INVESTOR.FB.COM (last visited Nov. 14, 2023).

[19]    Specifications for Facebook Pixel Standard Events, https://www.facebook.com/business/help/402791146561655?id=120537668283214 2 (last visited Nov. 14, 2023); see META PIXEL, GUIDES, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/ (last visited Nov. 14, 2023); see also BEST PRACTICES FOR META PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=120537668283214 2 (last visited Nov. 14, 2023); META MARKETING API, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/ (last visited Nov. 14, 2023).

21

80.    Advertisers, such as Defendant, can track other user actions and can create their own tracking parameters by building a "custom event."[20]

81.    One such Business Tool is the tracking Meta Pixel which "tracks the people and type of actions they take."[21]

82.    When a user accesses a webpage that is hosting the Pixel, their communications with the host webpage are instantaneously and surreptitiously duplicated and sent to Facebook's servers—traveling directly from the user's browser to Facebook's server.

83.    Thecontemporaneous and secret transmission contains the original GET request sent to the host website, along with additional data that the Pixel is configured to collect. This transmission is initiated by Facebook code and concurrent with the communications with the host website. Two sets of code are thus automatically contemporaneously run as part of the browser's attempt to load and read Defendant's Website—Defendant's own code, and Facebook's embedded code.

84.    Accordingly, during the same transmissions, the Website routinely provides Facebook with its customers' Facebook IDs, IP addresses, and/or device IDs and the other information they input into Defendant's Website, including not only their medical searches, treatment requests, and the webpages they view, but also their name, email address, or phone number. This is precisely the type of identifying information that HIPAA requires healthcare providers to de-anonymize

---

[20] ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142; *see also* META MARKETING API, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/ (last visited Nov. 14, 2023).

[21] RETARGETING, https://www.facebook.com/business/goals/retargeting (last visited Nov. 14, 2023).

to protect the privacy of patients.[22] Plaintiffs' and Class Members' identities can be easily determined based on the Facebook ID, IP address and/or reverse lookup from the collection of other identifying information that was improperly disclosed.

85.    After intercepting and collecting this information, Facebook processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences. If the website visitor is also a Facebook user, the information collected via the Facebook pixel is associated with the user's Facebook ID that identifies their name and Facebook profile, i.e., their real-world identity.

86.    A user's FID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the user, including pictures, personal interests, work history, relationship status, and other details. Because the user's Facebook ID uniquely identifies an individual's Facebook account, Facebook—or any ordinary person—can easily use the Facebook Profile ID to quickly and easily locate, access, and view the user's corresponding Facebook profile.  To find the Facebook account associated with a c_user cookie, one simply needs to type www.facebook.com/ followed by the c_user ID.

87.    This disclosed PHI and PII allows Facebook to know that a specific patient is seeking confidential medical care and the type of medical care being sought (in the case of Walgreens, purchasing sensitive healthcare products including Plan B, HIV tests, pregnancy tests, prenatal vitamins, hyperglycemic/hypoglycemic management products and numerous other products to diagnose and/or treat highly sensitive and private conditions), and Facebook then sells that information to marketers who will online target Plaintiffs and Class Members.

---

[22]    *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last visited Nov. 14, 2023).

### III.    DEFENDANT DISCLOSED PLAINTIFFS' & CLASS MEMBERS' PRIVATE INFORMATION TO META & USED PLAINTIFFS' & CLASS MEMBERS' PRIVATE INFORMATION FOR ITS OWN PURPOSES.

88.    Starting on date unknown and continuing to the present, Defendant embedded the Meta Pixel on and throughout its Website and transmitted Private Information shared by Plaintiffs and Class Members, without their consent, to Meta in accordance with the Meta Pixel's configuration.

89.    Walgreens installed the Meta Pixel on its Website - www.walgreens.com. When Plaintiffs or another Class Member visited that website and completed the steps necessary to purchase sensitive healthcare products including Plan B, HIV tests, pregnancy tests, prenatal vitamins, hyperglycemic/hypoglycemic management products and numerous other products to diagnose and/or treat highly sensitive and private conditions, the Meta Pixel automatically caused Plaintiffs' or Class Member's personal identifiers, including IP addresses and the c_user, _fr, _datr, and _fbp cookies, to be transmitted to Meta, attached to the fact that the Plaintiffs or Class Member had visited the Website and the titles of the webpages the Plaintiffs or Class Member visited.

90.    Rather than merely transmit the "automatic events" that the Meta Pixel automatically collects and transmits from a website without the website owner or developer being required to add any additional code, on information and belief, Defendant intentionally configured the Meta Pixel on its Website to track, collect, and disclose "custom events" such as the name of the sensitive healthcare products including Plan B, HIV tests, pregnancy tests, prenatal vitamins, hyperglycemic/hypoglycemic management products and numerous other products to diagnose and/or treat highly sensitive and private conditions that a customer was seeking to purchase, and the fact that the customer was purchasing these sensitive healthcare products.

91.     Moreover, the Meta Pixel on Defendant's Website was also intentionally configured or authorized to use a feature called "automatic advanced matching." That feature scans forms on a website looking for fields that may contain personally identifiable information like a first name, last name, or email address, and then causes that information to be disclosed to Meta. On Defendant's Website this feature collected, at a minimum, the first names and last names of Plaintiffs and other Class Members as displayed on the checkout page of the Website.

92.     The data collected by the automatic advanced matching feature is disclosed to Meta in an obfuscated form known as a "hash." But Meta is able to determine the pre-obfuscated version of the data. Indeed, Meta uses the hashed information to link other data collected and disclosed by the Meta Pixel to Plaintiffs' and Class Members' Facebook and Instagram profiles.

93.     Thus, put simply, when Plaintiffs or other Class Members used Defendant's Website to purchase sensitive healthcare products including Plan B, HIV tests, pregnancy tests, prenatal vitamins, hyperglycemic/hypoglycemic management products and numerous other products to diagnose and/or treat highly sensitive and private conditions, their identities, personal identifiers, and health information (including their medical conditions and treatments sought) was disclosed to Meta.

94.     On information and belief, Defendant disclosed Plaintiffs' and Class Members' Private Information to Meta in order to permit Defendant to improve its marketing and advertising, in order to increase Defendant's revenues and profits. Thus, Defendant used Plaintiffs' and Class Members' Private Information for its own marketing and advertising purposes, in an attempt to increase its own revenues and profits.

## IV.    WALGREENS DOES NOT DISCLOSE THAT IT SENDS PRIVATE INFORMATION TO THIRD PARTIES FOR MARKETING PURPOSES & VIOLATES ITS OWN PRIVACY POLICIES.

95. Walgreens' privacy policies, including its current policies and historical policies during the Class Period, represent to Plaintiffs and Class Members that it will keep Private Information private and secure and that it will only disclose Private Information under certain circumstances, *none of which is true*.

96. These Privacy Policies state that Plaintiffs' and Class Members' PHI will not be shared for marketing purposes without prior, written permission.

97. Plaintiffs and Class Members have not provided Walgreens with written permission to share their PHI for marketing purposes.

98. Moreover, Defendant's privacy policies, despite their increasing breadth over the years with respect to sharing customers' data, have never specifically disclosed to Plaintiffs or Class Members that their viewing or purchase of sensitive healthcare products will be sent to social media companies for any purposes, nor has Defendant every obtained informed consent from Plaintiffs or Class Members to do so.[23]

99. Even non-Facebook users can be individually identified via the information gathered on the Digital Platforms, like an IP address or personal device identifying information. This is precisely the type of information for which HIPAA requires the use of de-identification techniques to protect patient privacy.[24]

100. In fact, in an action pending against Facebook related to use of its Meta Pixel on healthcare provider web properties, Facebook explicitly stated it requires

---

[23] Regardless, even if Walgreens did attempt to disavow its responsibility for keeping its patients' Private Information secure by having them sign a PHI disclosure form, that is also not allowed. "[T]he Privacy Rule does **not** permit disclosures of PHI to a tracking technology vendor based solely on a regulated entity informing individuals in its privacy policy, notice, or terms and conditions of use that it plans to make such disclosures." https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Dec.7, 2023).

[24] https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last visited Nov. 14, 2023).

SECOND AMENDED CLASS ACTION COMPLAINT                CASE NO. 5:23-cv-01933-JGB-SP

Pixel users to "post a prominent notice on every page where the pixel is embedded and to link from that notice to information about exactly how the pixel works and what is being collected through it, so it is not invisible."[25]

101.    Defendant not only did not post such a notice, but it also falsely represented it would notify affected victims should a breach of unsecured PHI take place.

102.    Facebook further stated that "most providers [...] will not be sending [patient information] to Meta because it violates Meta's contracts for them to be doing that."[26]'

103.    Despite a lack of disclosure, Walgreens allowed third parties such as Meta to "listen in" on patients' confidential communications with Walgreens and to intercept and use for advertising purposes the very information it promised to keep private, in order to bolster its profits.

104.    As alleged herein, after Meta viewed and analyzed Plaintiffs' private communications with Walgreens, Plaintiffs began receiving targeted ads on their Facebook accounts related to the medical conditions and treatments they disclosed to Defendants.

## V.    UNIQUE PERSONAL IDENTIFIERS ARE PROTECTED HEALTH INFORMATION.

105.    While not all health data is covered under HIPAA, the law specifically applies to healthcare providers, health insurance providers and healthcare data clearinghouses.[27]

---

[25]    *See* Transcript of the argument on Plaintiffs' Motion for Preliminary Injunction in *In re Meta Pixel Healthcare Litigation*, Case No. CV-22-03580-WHO (N.D. Cal. Nov. 9, 2022) (Hon. J. Orrick), at 19:12-18; *see also In re Meta Pixel Healthcare Litig.*, 2022 WL 17869218 (N.D. Cal. Dec 22, 2022).

[26]    *Id.*, at 7:20-8:11.

[27]    *See* Alfred Ng & Simon Fondrie-Teitler, *This Children's Hospital Network*

106.   The HIPAA privacy rule sets forth policies to protect all individually identifiable health information that is held or transmitted, and there are approximately 18 HIPAA Identifiers that are considered PII. This information can be used to identify, contact or locate a single person or can be used with other sources to identify a single individual.

107.   These HIPAA Identifiers, as relevant here, include names, dates related to an individual, email addresses, device identifiers, web URLs and IP addresses.[28]

108.   Based on information and belief, Walgreens improperly disclosed Plaintiffs' and Class Members' computer IP addresses to third parties like Facebook, Google, Bing and Pinterest through its use of the Pixels *in addition to* names, phone numbers, email addresses, dates of birth, Walgreens client ID numbers, services selected, assessment responses, patient statuses, medical conditions, treatments, and provider information.

109.   An IP address is a number that identifies the address of a device connected to the Internet.

110.   IP addresses are used to identify and route communications on the Internet.

111.   IP addresses of individual Internet users are used by Internet service providers, websites, and third-party tracking companies to facilitate and track Internet communications.

---

*Was Giving Kids' Information to Facebook* (June 21, 2022), available at https://themarkup.org/pixel-hunt/2022/06/21/this-childrens-hospital-network-was-giving-kids-information-to-facebook (stating that "[w]hen you are going to a covered entity's website, and you're entering information related to scheduling an appointment, including your actual name, and potentially other identifying characteristics related to your medical condition, there's a strong possibility that HIPAA is going to apply in those situations") (last visited Nov. 29, 2023).

[28] *Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last visited Nov. 27, 2023).

SECOND AMENDED CLASS ACTION COMPLAINT                    CASE NO. 5:23-cv-01933-JGB-SP

112.    Facebook tracks every IP address ever associated with a Facebook user. Google also tracks IP addresses associated with Internet users.

113.    Facebook, Google, and other third-party marketing companies track IP addresses for targeting individual homes and their occupants with advertising.

114.    Under HIPAA, an IP address is considered personally identifiable information, defining personally identifiable information as including "any unique identifying number, characteristic or code" and specifically listing IP addresses among examples. 45 C.F.R. § 164.514 (2).

115.    HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *see also*, 45 C.F.R. § 164.514(b)(2)(i)(O). Consequently, Walgreens' disclosure of Plaintiffs' and Class Members' IP addresses violated HIPAA and industry-wide privacy standards.

## VI.    WALGREENS' USE OF THE PIXEL VIOLATES HIPAA.

116.    Under Federal Law, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.[29]

117.    Guidance from the United States Department of Health and Human Services instructs healthcare providers that patient status alone is protected by HIPAA.

118.    The Privacy Rule broadly defines PHI as IIHI that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

---

[29]    HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

119.    IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

120.    Under the HIPAA de-identification rule, "health information is not individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'"; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed;

A. Names;

***

H. Medical record numbers;

***

J.  Account numbers;

***

M. Device identifiers and serial numbers;

N. Web Universal Resource Locators (URLs);

O. Internet Protocol (IP) address numbers; … and

P.  Any other unique identifying number, characteristic, or code… and"

> The covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

45 C.F.R. § 160.514.

121. The HIPAA Privacy Rule requires any "covered entity"—which includes health care providers—to maintain appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ 160.103, 164.502.

122. Even the fact that an individual is receiving a medical service, *i.e.*, is a patient of a particular entity, can be Protected Health Information. HHS has instructed health care providers that, while identifying information alone is not necessarily PHI if it were part of a public source such as a phonebook because it is not related to health data, "[i]f such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."[30]

123. Consistent with this restriction, the HHS has issued marketing guidance that provides, "With limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or

---

[30]     *See Guidance Regarding Methods for De-Identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last visited Nov. 14, 2023).

31

enrollees to third parties without obtaining authorization from each person on the list."[31]

124.  Here, Defendant provided patient information to third parties in violation of the Privacy Rule.

125.  HIPAA also requires Defendant to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(c), and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

126.  Walgreens further failed to comply with other HIPAA safeguard regulations as follows:

a.  Failing to ensure the confidentiality and integrity of electronic PHI that Walgreens created, received, maintained, and transmitted in violation of 45 C.F.R. § 164.306(a)(1);

b.  Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. section 164.308(a)(1);

c.  Failing to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Walgreens in violation of 45 C.F.R. § 164.308(a)(6)(ii);

d.  Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

---

[31]  *Marketing*, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html (last visited Nov. 14, 2023).

e.    Failing to protect against reasonably anticipated uses or disclosures of electronic PHI not permitted under the privacy rules pertaining to individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

f.    Failing to ensure compliance with HIPAA security standard rules requiring adequate workforce comprehensive training instead of training software used to test staff by imitating phishing emails in violation of 45 C.F.R. § 164.306(a)(4);

g.    Failing to effectively train its workforce (including independent contractors) on the policies and procedures for PHI as necessary and appropriate to carry out job functions while maintaining security of PHI beyond using imitation phishing email software in violation of 45 C.F.R. §§ 164.530(b) and 164.308(a)(5); and

h.    Failing to design, implement, and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. § 164.530(c).

127.    In Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, HHS instructed in 2012:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data… If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[32]

---

[32] *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability*

128.    In its guidance for Marketing, HHS further instructed in 2003:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list*. (Emphasis added).[33]

129.    HHS has repeatedly instructed for years that patient status is protected by the HIPAA Privacy Rule:

a.    "The sale of a patient list to a marketing firm" is not permitted under HIPAA. 65 Fed. Reg. 82717 (Dec. 28, 2000);

b.    "A covered entity must have the individual's prior written authorization to use or disclose protected health information for marketing communications," which includes disclosure of mere patient status through a patient list. 67 Fed. Reg. 53186 (Aug. 14, 2002); and

c.    It would be a HIPAA violation "if a covered entity impermissibly disclosed a list of patient names, addresses, and hospital identification numbers." 78 Fed. Reg. 5642 (Jan. 25, 2013).

---

*Act (HIPAA) Privacy Rule* (Nov. 26, 2012) at 5, available at https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf (last visited Nov. 14, 2023).

[33] https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf (April 3, 2003) (last visited Nov. 14, 2023).

34

130.   In addition, the Office for Civil Rights at HHS has issued a Bulletin to highlight the obligations of HIPAA covered entities and business associates ("regulated entities") under the HIPAA Privacy, Security, and Breach Notification Rules ("HIPAA Rules") when using online tracking technologies ("tracking technologies").[34]

131.   The Bulletin expressly provides that "**[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules.**"[35]

132.   Tracking technology vendors like Facebook and Google are considered business associates under HIPAA where, as here, they provide services to Defendant and receive and maintain PHI.

> Furthermore, tracking technology vendors are business associates if they create, receive, maintain, or transmit PHI on behalf of a regulated entity for a covered function (*e.g.* health care operations) or provide certain services to or for a covered entity (or another business associate) that involve the disclosure of PHI. In these circumstances, regulated entities must ensure that the disclosures made to such vendors are permitted by the Privacy Rule and enter into a business associate agreement (BAA) with these tracking technology vendors to ensure that PHI is protected in accordance with the HIPAA Rules. For example, if an individual makes an appointment through the website of a covered health clinic for health services and that website uses third party tracking technologies, then the website might automatically transmit information regarding the appointment and the individual's IP address

---

[34] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Nov. 14, 2023).

[35] *Id.* (emphasis in original).

to a tracking technology vendor. In this case, the tracking technology vendor is a business associate and a BAA is required.[36]

133. The Bulletin further explained that health care providers violate HIPAA when they use tracking technologies that disclose an individual's identifying information (like an IP address) even if no treatment information is included and even if the individual does not have a relationship with the health care provider:

How do the HIPAA Rules apply to regulated entities' use of tracking technologies?

Regulated entities disclose a variety of information to tracking technology vendors through tracking technologies placed on a regulated entity's website or mobile app, including individually identifiable health information (IIHI) that the individual providers when they use regulated entities' websites or mobile apps. This information might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, medical device IDs, or any unique identifying code. All such IIHI collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services. **This is because, when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (i.e. it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present, or future health or health care or payment for care.**[37]

---

[36] *Id.*

[37] *Id.* (emphasis added).

36

134.   HIPAA applies to Defendant's webpages with tracking technologies even outside the patient portal:

> Tracking on unauthenticated webpages
>
> [T]racking technologies on unauthenticated webpages may have access to PHI, in which case the HIPAA Rules apply to the regulated entities' use of tracking technologies and disclosures to tracking technology vendors. Examples of unauthenticated webpages where the HIPAA Rules apply include: The login page of a regulated entity's patient portal (which may be the website's homepage or a separate, dedicated login page), or a user registration webpage where an individual creates a login for the patient portal **… [and pages] that address[] specific symptoms or health conditions, such as pregnancy or miscarriage, or that permits individuals to search for doctors or schedule appointments without entering credentials may have access to PHI in certain circumstances**. For example, tracking technologies could collect an individual's email address and/or IP address when the individual visits a regulated entity's webpage to search for available appointments with a health care provider. In this example, the regulated entity is disclosing PHI to the tracking technology vendor, and thus the HIPAA Rules apply.[38]

135.   HHS also explained in the Bulletin that tracking technologies on health care providers' patient portals "generally have access to PHI" and may access diagnoses and treatment information, in addition to other sensitive data:

> Tracking on user-authenticated webpages
>
> Regulated entities may have user-authenticated webpages, which require a user to log in before they are able to access the webpage, such as a patient or health plan beneficiary portal or a telehealth platform. **Tracking technologies on**

---

[38] *Id.* (emphasis added).

**a regulated entity's user-authenticated webpages generally have access to PHI.** Such PHI may include, for example, an individual's IP address, medical record number, home or email addresses, dates of appointments, or other identifying information that the individual may provide when interacting with the webpage. Tracking technologies within user-authenticated webpages may even have access to an individual's diagnosis and treatment information, prescription information, billing information, or other information within the portal. Therefore, a regulated entity must configure any user-authenticated webpages that include tracking technologies to allow such technologies to only use and disclose PHI in compliance with the HIPAA Privacy Rule and must ensure that the electronic protected health information (ePHI) collected through its website is protected and secured in accordance with the HIPAA Security Rule.[39]

136.    The Bulletin is not a pronouncement of new law, but instead a reminder to covered entities and business associates of their longstanding obligations under existing guidance.

137.    The Bulletin notes that "it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors," then explains how online tracking technologies violate the same HIPAA rules that have existed for decades.[40]

_____

[39] *Id.* (emphasis added).

[40] *Id.* (citing, *e.g.*, Modifications of the HIPAA [Rules], Final Rule," 78 FR 5566, 5598, a rulemaking notice from January 25, 2013, which stated: "[P]rotected health information … may not necessarily include diagnosis-specific information, such as information about the treatment of an individual, and may be limited to demographic or other information not indicative of the type of health care services provided to an individual. If the information is tied to a covered entity, then it is protected health information by definition since it is indicative that the individual received health care services or benefits from the covered entity, and therefore it must be protected … in accordance with the HIPAA rules.").

138.   In other words, HHS has expressly stated that Defendant has violated HIPAA Rules by implementing the Tracking Pixel.

## VII.   WALGREENS VIOLATED INDUSTRY STANDARDS.

139.   It is a cardinal rule that a medical provider's duty of confidentiality is embedded in the physician-patient and hospital-patient relationship.

140.   The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

141.   AMA Code of Ethics Opinion 3.1.1 provides:

> Protecting information gathered in association with the care of the patient is a core value in health care… Patient privacy encompasses a number of aspects, including, … personal data (informational privacy)[.] [41]

142.   AMA Code of Medical Ethics Opinion 3.2.4 provides:

> Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (A) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access

---

[41]   American Medical Association, *AMA Principles of Medical Ethics: I, IV, Chapter 3: Opinions on Privacy, Confidentiality & Medical Records*, https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/code-of-medical-ethics-chapter-3.pdf (last visited Nov. 14, 2023).

would be granted.

143.   AMA Code of Medical Ethics Opinion 3.3.2 provides:

> Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically…must: (c) Release patient information only in keeping ethics guidelines for confidentiality.[42]

144.   Walgreens' use of the Pixel also violates Federal Trade Commission ("FTC") data security guidelines. The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. The FTC's October 2016 publication *Protecting Personal Information: A Guide for Business*[43] established cyber-security guidelines for businesses.

145.   These guidelines state that businesses should protect the personal patient information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network vulnerabilities; and implement policies to correct any security problems.

146.   Upon information and good faith belief, Walgreens failed to implement these basic, industry-wide data security practices.

## VIII.  USERS' REASONABLE EXPECTATION OF PRIVACY.

147.   Plaintiffs and Class Members were aware of Walgreens' duty of confidentiality when they sought sensitive healthcare supplies from Walgreens.

148.   Indeed, at all times when Plaintiffs and Class Members provided their PII and PHI to Walgreens, they each had a reasonable expectation that the

---

[42]   *Id*.

[43]   https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Nov. 14, 2023).

information would remain confidential and that Walgreens would not share the Private Information with third parties for a commercial purpose, unrelated to patient care.

149.  Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative consent before a company collects and shares its customers' data to be one of the most important privacy rights.

150.  For example, a recent Consumer Reports study shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[44]

151.  Personal data privacy and obtaining consent to share Private Information are material to Plaintiffs and Class Members.

## IX.    DEFENDANT WAS ENRICHED & BENEFITTED FROM THE USE OF THE PIXEL & UNAUTHORIZED DISCLOSURES.

152.  The primary motivation and a determining factor in Defendant's interception and disclosure of Plaintiffs' and Class Members' Private Information was to commit criminal and tortious acts in violation of federal and state laws as alleged herein, namely, the use of patient data for advertising in the absence of express written consent. Defendant's further use of the Private Information after the initial interception and disclosure for marketing and revenue generation was in violation of HIPAA and an invasion of privacy.  In exchange for disclosing the personally identifiable information of its patients, Defendant is compensated by

---

[44]     *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/ (last visited Nov. 14, 2023).

Facebook in the form of enhanced advertising services and more cost-efficient marketing on Facebook.

153.    Walgreens used the Pixel on its Digital Platforms for its own purposes of marketing and profits.

154.    Based on information and belief, Walgreens receives compensation from third parties like Facebook and Google in the form of enhanced advertising services and more cost-efficient marketing on third-party platforms in exchange for disclosing patients' personally identifiable information.

155.    Based on information and belief, Walgreens was advertising its services on Facebook, for one, and the Pixel was used to "help [Defendant] understand which types of ads and platforms are getting the most engagement[.]"[45]

156.    Retargeting is a form of online marketing that targets users with ads based on their previous Internet communications and interactions.

157.    Upon information and belief, Walgreens re-targeted customers and potential customers to get more people to use its services. These customers include Plaintiffs and Class Members.

158.    By utilizing the Pixel, the cost of advertising and retargeting was reduced, thereby benefitting and enriching Walgreens.

## X.    PLAINTIFFS' & CLASS MEMBERS' DATA HAD FINANCIAL VALUE.

159.    Moreover, Plaintiffs' and Class Members' Private Information had value and Defendant's disclosure and interception harmed Plaintiffs and the Class.

160.    Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

---

[45]    RETARGETING, https://www.facebook.com/business/goals/retargeting (last visited Nov. 14, 2023).

161.  The value of health data in particular is well-known and has been reported on extensively in the media. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[46]

162.  Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[47]

163.  Several companies have products through which they pay consumers for a license to track certain information. Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies that pay for browsing history information.

164.  Facebook itself has paid users for their digital information, including browsing history. Until 2019, Facebook ran a "Facebook Research" app through which it paid $20 a month for a license to collect browsing history information and other communications from consumers between the ages 13 and 35.

165.  Tech companies are under particular scrutiny because they already have access to a massive trove of information about people, which they use to serve their own purposes, including potentially micro-targeting advertisements to people with certain health conditions. The monetary value to Plaintiffs and Class Members of their sensitive medical information that Walgreens shared with Meta and others without consent—such as Plaintiffs' and Class Members' intent to purchase certain medical products and inferences that Plaintiffs and Class Members had particular

---

[46]  *See* https://time.com/4588104/medical-data-industry/ (last visited Nov. 14, 2023).

[47]  *See* https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html (last visited Nov. 14, 2023).

SECOND AMENDED CLASS ACTION COMPLAINT                    CASE NO. 5:23-cv-01933-JGB-SP

health conditions that were treated by those medical products—was forever diminished by Walgreens' disclosure of that information to Meta and others.

166.    Policymakers are proactively calling for a revision and potential upgrade of the HIPAA privacy rules out of concern for what might happen as tech companies continue to march into the medical sector.[48]

167.    Private Information is also a valuable commodity to identity thieves. As the FTC recognizes, identity thieves can use Private Information to commit an array of crimes that include identity theft and medical and financial fraud.[49] A robust "cyber black market" exists where criminals openly post stolen PII and PHI on multiple underground Internet websites, commonly referred to as the dark web.

168.    While credit card information and associated IIHI can sell for as little as $1–$2 on the black market, PHI can sell for as much as $363.[50]

169.    PHI is particularly valuable because criminals can use it to target victims with frauds that take advantage of their medical conditions.

170.    PHI can also be used to create fraudulent insurance claims and facilitate the purchase and resale of medical equipment, and it can help criminals gain access to prescriptions for illegal use or sale.

171.    Medical identity theft can result in inaccuracies in medical records, costly false claims, and life-threatening consequences. If a victim's health information is comingled with other records, it can lead to misdiagnoses or mistreatment.

---

[48]    *Id.*

[49]    FTC, *Warning Signs of Identity Theft, available at*: https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft (last visited Nov. 14, 2023).

[50]    Center for Internet Security, *Data Breaches: In the Healthcare Sector, available at*: https://www.cisecurity.org/blog/data-breaches-in-the-healthcare-sector/ (last accessed Nov. 14, 2023).

172.    The FBI Cyber Division issued a Private Industry Notification on April 8, 2014 that advised the following:

> Cyber criminals are selling [medical] information on the black market at a rate of $50 for each partial EHR, compared to $1 for a stolen social security number or credit card number. EHR can then be used to file fraudulent insurance claims, obtain prescription medication, and advance identity theft. EHR theft is also more difficult to detect, taking almost twice as long as normal identity theft.

173.    Cybercriminals often trade stolen Private Information on the black market for years following a breach or disclosure. Stolen Private Information can be posted on the Internet, making it publicly available.

174.    Walgreens gave away Plaintiffs' and Class Members' communications and transactions on its Digital Platforms without permission.

175.    The unauthorized access to Plaintiffs' and Class Members' private and Personal Information has diminished the value of that information, resulting in harm to Website Users, including Plaintiffs and Class Members.

## XI.    DEFENDANT USED AND DISCLOSED PLAINTIFFS' & CLASS MEMBERS' PRIVATE INFORMATION WITHOUT PLAINTIFFS' OR CLASS MEMBERS' KNOWLEDGE, CONSENT, AUTHORIZATION OR FURTHER ACTION.

176.    The tracking tools incorporated into, embedded in, or otherwise permitted on Defendant's Website were invisible to Plaintiffs and Class Members while using that Website. The Meta Pixels on Defendant's Website were seamlessly integrated into the Website such that there was no reason for Plaintiffs or any Class Member to be aware of or to discover their presence.

177.    Plaintiffs and Class Members were shown no disclaimer or warning that their Private Information would be disclosed to any unauthorized third party without their express consent.

178.   Plaintiffs and Class Members had no idea that their Private Information was being collected and transmitted to an unauthorized third party.

179.   Because Plaintiffs and Class Members had no idea of the presence of Meta Pixels on Defendant's website, or that their Private Information would be collected and transmitted to Meta, they could not and did not consent to Walgreens' conduct.

180.   Plaintiffs and Class Members did not give consent or authorization for Defendant to disclose their Private Information to Meta or to any third party for marketing purposes.

181.   Moreover, Defendant's Notice of Privacy Practices, as described above, provided no indication to Plaintiffs or Class Members that their Private Information would be disclosed to Meta or any unauthorized third party.

## ALLEGATIONS SPECIFIC TO PLAINTIFFS

### *Plaintiff R.C.*

182.   Within the last year, and numerous other times, Plaintiff R.C. visited the Website, while in California, and sought to purchase sensitive healthcare products.

183.   On at least one occasion, within the last year, Plaintiff R.C. specifically sought to purchase Monistat in order to treat a vaginal yeast infection and placed Monistat in her virtual shopping cart on the Website.

184.   By interacting with Defendant's Digital Platforms, Plaintiff R.C.'s Private Information was disclosed to Meta through Walgreens' placement of the Meta Pixel on the webpages she visited on Defendant's Digital Platforms, including, but not limited to, the webpages for the search engine and the specific Monistat product that she placed in her virtual shopping cart on the Website, as well as the virtual shopping cart page. That information included, but was not limited to, her intent to purchase Monistat when she placed Monistat into her virtual shopping cart

46

on the Website and the inference that she had a yeast infection.

185.   Plaintiff R.C.'s Private Information that was disclosed to Meta had monetary value to Plaintiff R.C., and Walgreens gave it away to Meta without Plaintiff R.C.'s consent.

186.   Plaintiff R.C. had an active Facebook account at the time of her interaction with Defendant's Website.

187.   Plaintiff R.C. would not have used the Website to purchase sensitive healthcare products including Monistat had she known that her Private Information would be disclosed to unauthorized third parties.

188.   Plaintiff R.C. believed that because she was on the website of a healthcare provider and pharmacy, her Private Information would be protected and kept confidential.

189.   Plaintiff R.C. saw nothing on the Website that suggested to her that her Private Information would be disclosed or released to an unauthorized third party.

190.   Plaintiff R.C. did not authorize, consent to, or otherwise engage or permit the release of her Private Information to Meta or any third party.

### *Plaintiff T.S.*

191.   Within the last year, and numerous other times, Plaintiff T.S. visited the Website, while in Virginia, and sought to purchase sensitive healthcare products.

192.   On at least one occasion, within the last year, Plaintiff T.S. specifically sought to purchase a diabetes testing kit on the Website.

193.   By interacting with Defendant's Digital Platforms, Plaintiff T.S.'s Private Information was disclosed to Meta through Walgreens' placement of the Meta Pixel on the webpages she visited on Defendant's Digital Platforms, including, but not limited to, the webpages for the search engine and the specific diabetes test kit product that she placed in her virtual shopping cart on the Website, as well as the virtual shopping cart page. That information included, but was not limited to, her

intent to purchase a diabetes test kit when she placed the diabetes test kit into her virtual shopping cart on the Website and the inference that she or a family member had diabetes.

194.   Plaintiff T.S.'s Private Information that was disclosed to Meta had monetary value to Plaintiff T.S., and Walgreens gave it away to Meta without Plaintiff T.S.'s consent.

195.   Plaintiff T.S. had an active Facebook account at the time of her interaction with Defendant's Website, and shortly after visiting Walgreens Website to purchase the diabetes testing kit, she started to receive unsolicited advertisements *on Facebook* relating to her purchase of the diabetes testing kit.

196.   Plaintiff T.S. would not have used the Website to purchase sensitive healthcare products including the diabetes testing kit had she known that her Private Information would be disclosed to unauthorized third parties.

197.   Plaintiff T.S. believed that because she was on the website of a healthcare provider and pharmacy, her Private Information would be protected and kept confidential.

198.   Plaintiff T.S. saw nothing on the Website that suggested to her that her Private Information would be disclosed or released to an unauthorized third party.

199.   Plaintiff T.S. did not authorize, consent to, or otherwise engage or permit the release of her Private Information to Meta or any third party.

## TOLLING, CONCEALMENT & ESTOPPEL

200.   Any applicable statutes of limitation have been tolled by Defendant's knowing and active concealment of its incorporation of the Meta Pixel into its Website.

201.   The Meta Pixel and other tracking tools on Defendant's Website were and are entirely invisible to a website visitor.

202.   Through no fault or lack of diligence, Plaintiffs and Class Members

48

were deceived and could not reasonably discover Defendant's deception and unlawful conduct.

203. Plaintiffs were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their part.

204. Defendant had exclusive knowledge that its Website incorporated the Meta Pixel and other tracking tools and yet failed to disclose to customers, including Plaintiffs and Class Members, that by purchasing sensitive healthcare products including Plan B, HIV tests, pregnancy tests, prenatal vitamins, hyperglycemic/hypoglycemic management products and numerous other products to diagnose and/or treat highly sensitive and private conditions through Defendant's Website, Plaintiffs' and Class Members' Private Information would be disclosed or released to Meta and other unauthorized third parties.

205. Under the circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of its customers' Private Information. In fact, to the present Defendant has not conceded, acknowledged, or otherwise indicated to its customers that it has disclosed or released their Private Information to unauthorized third parties. Accordingly, Defendant is estopped from relying on any statute of limitations.

206. Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

207. The earliest that Plaintiffs or Class Members, acting with due diligence, could have reasonably discovered Defendant's conduct would have been shortly before the filing of this Complaint.

## **CLASS ACTION ALLEGATIONS**

208. Plaintiffs bring this action, on behalf of themselves and all others similarly situated, as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs seeks to represent two Classes, defined as follows:

49

## The Nationwide Class

"All natural persons who used Defendant's Website to purchase human healthcare products to treat sensitive health conditions concerning reproductive organs, sexual activity, and/or for hyperglycemic/hypoglycemic management and whose Private Information was disclosed or transmitted to Meta or any other unauthorized third party."

## The California Subclass

"All natural persons residing in California who used Defendant's Website to purchase human healthcare products to treat sensitive health conditions concerning reproductive organs, sexual activity, and/or for hyperglycemic/hypoglycemic management and whose Private Information was disclosed or transmitted to Meta or any other unauthorized third party."

## The Virginia Subclass

"All natural persons residing in Virginia who used Defendant's Website to purchase human healthcare products to treat sensitive health conditions concerning reproductive organs, sexual activity, and/or for hyperglycemic/hypoglycemic management and whose Private Information was disclosed or transmitted to Meta or any other unauthorized third party."

209. Excluded from the Class and the Subclasses are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

210. Plaintiffs reserve the right to modify or to amend the definition of the proposed classes before the Court determines whether certification is appropriate.

211. **Numerosity, Fed R. Civ. P. 23(a)(1).** The Class Members for each proposed Class are so numerous that joinder of all members is impracticable. Upon information and belief, there are millions of individuals whose Private Information may have been improperly accessed by Facebook and other unauthorized third parties, and the Classes are identifiable within Defendant's records.

212. **Commonality, Fed. R. Civ. P. 23(a)(2) and (b)(3).** Questions of law and fact common to each Class exist and predominate over any questions affecting

50

only individual Class Members. These include:

    a. Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiffs and Class Members;

    b. Whether Defendant had duties not to disclose the Private Information of Plaintiffs and Class Members to unauthorized third parties;

    c. Whether Defendant violated its Privacy Policies by disclosing the Private Information of Plaintiffs and Class Members to Facebook and/or additional third parties;

    d. Whether Defendant adequately, promptly and accurately informed Plaintiffs and Class Members that their Private Information would be disclosed to third parties;

    e. Whether Defendant violated the law by failing to promptly notify Plaintiffs and Class Members that their Private Information had been compromised;

    f. Whether Defendant adequately addressed and fixed the practices which permitted the disclosure of patient Private Information;

    g. Whether Defendant engaged in unfair, unlawful or deceptive practices by failing to safeguard the Private Information of Plaintiffs and Class Members;

    h. Whether Defendant violated the consumer protection statutes invoked herein;

    i. Whether Plaintiffs and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

    j. Whether Defendant knowingly made false representations as to its data security and/or Privacy Policy practices;

    k. Whether Defendant knowingly omitted material representations with respect to its data security and/or Privacy Policies practices;

    l. Whether Defendant's knowing disclosure of its patients' individually identifiable health information to Facebook is "criminal or tortious" under 18 U.S.C § 2511(2)(d); and

51

m. Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm they face as a result of Defendant's disclosure of their Private Information.

213. **Typicality, Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of those of other Class Members because all had their Private Information disclosed to third parties because of Defendant's use of Tracking Pixels.

214. **Adequacy, Fed. R. Civ. P. 23(a)(4).** Plaintiffs will fairly and adequately represent and protect the interests of Class Members in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiffs seeks no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages Plaintiffs has suffered are typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

215. **Superiority and Manageability, Fed. R. Civ. P. 23(b)(3).** Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against a large corporation, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

216. **Policies Generally Applicable to the Class.** This class action is also appropriate for certification because Defendant has acted or refused to act on

52

grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

217.    The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

218.    The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

219.    Based on information and belief, adequate and direct notice can be given to Class Members using information maintained in Defendant's records.

220.    Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the practices complained of herein, and Defendant may continue to act unlawfully as set

53

forth in this Complaint.

221.  Further, Defendant has acted or refused to act on grounds generally applicable to each Class and, accordingly, final injunctive or corresponding declaratory relief with regard to Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

222.  Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a.  Whether Defendant owed a legal duty to not disclose Plaintiffs' and Class Members' Private Information;

b.  Whether Defendant owed a legal duty to not disclose Plaintiffs' and Class Members' Private Information with respect to Defendant's Privacy Policies;

c.  Whether Defendant breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using and safeguarding their Private Information;

d.  Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

e.  Whether Defendant adequately and accurately informed Plaintiffs and Class Members that their Private Information would be disclosed to third parties;

f.  Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties; and

g.  Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

# COUNT I

## COMMON LAW INVASION OF PRIVACY - INTRUSION UPON SECLUSION
### *(On Behalf of Plaintiffs and the Nationwide Class and, alternatively, Plaintiff R.C. and the California Subclass and Plaintiff T.S. and the Virginia Subclass)*

223.   Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed Nationwide Class, the California Subclass, and the Virginia Subclass.

224.   Plaintiffs and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential communications and protected health information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiffs' and Class Members' knowledge or consent.

225.   Plaintiffs and Class Members had a reasonable expectation of privacy in their communications with Defendant via its Digital Platforms and the communications platforms and services therein.

226.   Plaintiffs and Class Members communicated sensitive and protected medical information and individually identifiable health information that they intended for only Defendant to receive and that they understood Defendant would keep private and secure.

227.   Defendant's disclosure of the substance and nature of those communications to third parties without the knowledge and consent of Plaintiffs and Class Members is an intentional intrusion on Plaintiffs' and Class Members' solitude or seclusion.

228.   Plaintiffs and Class Members had a reasonable expectation of privacy given Defendant's Privacy Policy and other representations.

SECOND AMENDED CLASS ACTION COMPLAINT    CASE NO. 5:23-cv-01933-JGB-SP

229.   Moreover, Plaintiffs and Class Members have a general expectation that their communications regarding healthcare with their healthcare providers will be kept confidential.

230.   Defendant's disclosure of private medical information coupled with individually identifying information is highly offensive to the reasonable person.

231.   As a result of Defendant's actions, Plaintiffs and Class Members have suffered harm and injury including, but not limited to, an invasion of their privacy rights.

232.   Plaintiffs and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to compensatory and/or nominal damages.

233.   Plaintiffs and Class Members seek appropriate relief for that injury including, but not limited to, damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests as a result of the intrusions upon their privacy.

234.   Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful and intentional nature of Defendant's actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

235.   Plaintiffs also seek such other relief as the Court may deem just and proper.

236.

## COUNT II

### NEGLIGENCE
***(On Behalf of Plaintiffs and the Nationwide Class and, alternatively, Plaintiff R.C. and the California Subclass and Plaintiff T.S. and the Virginia Subclass)***

56

237.   Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed Nationwide Class, California Subclass, and Virginia Subclass.

238.   Defendant Walgreens required Plaintiffs and Class Members to submit non-public personal information in order to obtain healthcare/medical products and/or services.

239.   Upon accepting, storing, and controlling the Private Information of Plaintiffs and the Class in its computer systems, Defendant owed, and continues to owe, a duty to Plaintiffs and the Class to exercise reasonable care to secure, safeguard and protect her highly sensitive Private Information from disclosure to third parties.

240.   Defendant breached this duty by failing to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class Members' Private Information from unauthorized disclosure.

241.   It was reasonably foreseeable that Defendant's failures to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class Members' Private Information through its use of the Pixels, Conversions API, and other tracking technologies would result in unauthorized third parties, such as Facebook, gaining access to such Private Information for no lawful purpose.

242.   Defendant's duty of care to use reasonable measures to secure and safeguard Plaintiffs' and Class Members' Private Information arose due to the special relationship that existed between Defendant and its customers, which is recognized by statute, regulations, and the common law.

243.   In addition, Defendant had a duty under HIPAA privacy laws, which were enacted with the objective of protecting the confidentiality of clients' healthcare information and set forth the conditions under which such information can be used, and to whom it can be disclosed. HIPAA privacy laws not only apply to healthcare providers and the organizations they work for, but to any entity that

57

may have access to healthcare information about a patient that—if it were to fall into the wrong hands—could present a risk of harm to the patient's finances or reputation.

244.  Defendant Walgreens' duty to use reasonable security measures under HIPAA required Defendant Walgreens to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1). Some or all of the healthcare, medical, and/or medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

245.  In addition, Defendant Walgreens had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

246.  Defendant Walgreens' duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

247.  Defendant's own conduct also created a foreseeable risk of harm to Plaintiffs and Class Members and their Private Information.

248.  Defendant's misconduct included the failure to (1) secure Plaintiffs' and Class Members' Private Information; (2) comply with industry standard data security practices; (3) implement adequate website and event monitoring; (4) implement the systems, policies, and procedures necessary to prevent unauthorized disclosures resulting from the use of the Pixels, Conversions API, and other tracking technologies; and (5) prevent unauthorized access to Plaintiffs' and Class Members' Private Information by sharing that information with Facebook and other third parties. Defendant's failures and breaches of these duties constituted negligence.

58

249.   As a direct result of Defendant's breach of its duty of confidentiality and privacy and the disclosure of Plaintiffs' and Class Members' Private Information, Plaintiffs and the Class have suffered damages that include, without limitation, loss of the benefit of the bargain, increased infiltrations into their privacy through spam and targeted advertising they did not ask for, loss of privacy, loss of confidentiality, embarrassment, emotional distress, humiliation and loss of enjoyment of life.

250.   Defendant's wrongful actions and/or inactions and the resulting unauthorized disclosure of Plaintiffs' and Class Members' Private Information constituted (and continue to constitute) negligence at common law.

251.   Plaintiffs and Class Members are entitled to compensatory, nominal, and/or punitive damages, and Plaintiffs and Class Members are entitled to recover those damages in an amount to be determined at trial.

252.   Defendant Walgreens' negligent conduct is ongoing, in that it still holds the Private Information of Plaintiffs and Class Members in an unsafe and unsecure manner. Therefore, Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant Walgreens to (i) strengthen its data security systems and monitoring procedures; (ii) cease sharing Plaintiffs' and Class Members' Private Information with Facebook and other third parties without Plaintiffs' and Class Members' express consent; and (iii) submit to future annual audits of its security systems and monitoring procedures.

## COUNT III

### UNJUST ENRICHMENT
#### (*On Behalf of Plaintiffs and the Nationwide Class and, alternatively, Plaintiff R.C. and the California Subclass and Plaintiff T.S. and the Virginia Subclass*)

253.   Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the

59

proposed Nationwide Class, California Subclass, and Virginia Subclass.

254.   Plaintiffs plead this claim in the alternative to their breach of implied contract claim.

255.   Upon information and belief, Defendant Walgreens funds its data security measures entirely from its general revenue, including payments made by or on behalf of Plaintiffs and the Class Members.

256.   As such, a portion of the payments made by or on behalf of Plaintiffs and the Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant Walgreens.

257.   Plaintiffs and Class Members conferred a monetary benefit on Defendant Walgreens. Specifically, they purchased goods and services from Defendant and/or its agents and in so doing provided Defendant with their Private Information.

258.   In exchange, Plaintiffs and Class Members should have received from Defendant Walgreens the goods and services that were the subject of the transaction and have their Private Information protected with adequate data security.

259.   Defendant Walgreens knew that Plaintiffs and Class Members conferred a benefit which Defendant Walgreens accepted. Defendant Walgreens profited from these transactions and used the Private Information of Plaintiffs and Class Members for business purposes.

260.   In particular, Defendant Walgreens enriched itself by obtaining the inherent value of Plaintiffs' and Class Members' Private Information, and by saving the costs it reasonably should have expended on marketing and/or data security measures to secure Plaintiffs' and Class Members' Private Information.

261.   Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant Walgreens' decision to prioritize its own profits over the requisite security.

262.   Under the principles of equity and good conscience, Defendant Walgreens should not be permitted to retain the money belonging to Plaintiffs and Class Members, because Defendant Walgreens failed to implement appropriate data management and security measures that are mandated by industry standards.

263.   Defendant Walgreens failed to secure Plaintiffs' and Class Members' Private Information and, therefore, did not provide full compensation for the benefit Plaintiffs and Class Members provided.

264.   If Plaintiffs and Class Members knew that Defendant Walgreens had not reasonably secured their Private Information, they would not have agreed to provide their Private Information to Defendant Walgreens.

265.   Plaintiffs and Class Members have no adequate remedy at law for this count. An unjust enrichment theory provides the equitable disgorgement of profits even where an individual has not suffered a corresponding loss in the form of money damage.

266.   Furthermore, California law permits a standalone claim for unjust enrichment, allowing the court to construe the cause of action as a quasi-contract claim. *E.g., Astiana v. Hain Celestial Group, Inc*., 783 F.3d 753, 756 (9th Cir. 2015). California law recognizes a right to disgorgement of profits resulting from unjust enrichment, even where an individual has not suffered a corresponding loss. *In re Facebook, Inc. Internet Tracking Litig*., 956 F.3d 589, 599 (9th Cir. 2020). California law requires disgorgement of unjustly earned profits regardless of whether a Defendant's actions caused a Plaintiffs to directly expend his or her own financial resources or whether a Defendant's actions directly caused the Plaintiffs' property to become less valuable. Under California law, a stake in unjustly earned profits exists regardless of whether an individual planned to sell his or her data or whether the individual's data is made less valuable.

267.   As a direct and proximate result of Defendant Walgreens' conduct, Plaintiffs and Class Members have suffered and will continue to suffer injury.

61

268.    Defendant Walgreens should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them, or to refund the amounts that Plaintiffs and Class Members overpaid for Defendant Walgreens' services.

## COUNT IV

**VIOLATIONS OF ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA")**
**18 U.S.C. § 2511(1), *et seq*.**
**Unauthorized Interception, Use, and Disclosure**
**(*On Behalf of Plaintiffs and the Nationwide Class*)**

269.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the Nationwide Class.

270.    The ECPA protects both sending and receipt of communications.

271.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

272.    The transmissions of Plaintiffs' PII and PHI to Defendant's Digital Platforms qualify as "communications" under the ECPA's definition of 18 U.S.C. § 2510(12).

273.    Electronic Communications. The transmission of PII and PHI between Plaintiffs and Class Members and Defendant's Digital Platforms with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

274.    Content. The ECPA defines content, when used with respect to

62

electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

275.   <u>Interception</u>. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

276.   <u>Electronical, Mechanical or Other Device</u>. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

    a.   Plaintiffs' and Class Members' browsers;

    b.   Plaintiffs' and Class Members' computing devices;

    c.   Defendant's web-servers; and

    d.   The Pixel code deployed by Defendant to effectuate the sending and acquisition of patient communications.

277.   By utilizing and embedding the Pixel on its Digital Platforms, Defendant intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiffs and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

278.   Specifically, Defendant intercepted Plaintiffs' and Class Members' electronic communications via the Pixel, which tracked, stored, and unlawfully disclosed Plaintiffs' and Class Members' Private Information to third parties such as Facebook.

279.   Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiffs and Class Members regarding PII and PHI, treatment, medication, and scheduling.

280.   By intentionally disclosing or endeavoring to disclose the electronic

63

communications of Plaintiffs and Class Members to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

281.    By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiffs and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

282.    <u>Unauthorized Purpose</u>. Defendant intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State—namely, invasion of privacy, among others.

283.    The ECPA provides that a "party to the communication" may liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C § 2511(2)(d).

284.    Defendant is not a party for purposes to the communication based on its unauthorized duplication and transmission of communications with Plaintiffs and the Class. However, even assuming Defendant is a party, Defendant's simultaneous, unknown duplication, forwarding, and interception of Plaintiffs' and Class Members' Private Information does not qualify for the party exemption.

285.    Defendant's acquisition of patient communications that were used and disclosed to Facebook was done for purposes of committing criminal and tortious acts in violation of the laws of the United States and individual States nationwide as set forth herein, including:

a.    Criminal violation of HIPAA, 42 U.S.C. § 1320d-6;

b.    Invasion of privacy;

64

c.      Breach of confidence;

d.      Breach of fiduciary duty;

e.      California Invasion of Privacy Act, §§ 630, *et seq.*;

f.      California Confidentiality of Medical Information Act, Cal. Civ. Code §§ 56, et seq.;

286.   Defendant's conduct violated 42 U.S.C. § 1320d-6 in that it:  Used and caused to be used cookie identifiers associated with specific patients without patient authorization;  and disclosed individually identifiable health information to Facebook without patient authorization.

287.   The penalty for violation is enhanced where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6.

288.   Defendant's conduct would be subject to the enhanced provisions of 42 U.S.C. § 1320d-6 because Defendant's use of the Facebook source code was for Defendant's commercial advantage to increase revenue from existing patients and gain new patients.

289.   Defendant is not exempt from ECPA liability under 18 U.S.C. § 2511(2)(d) on the ground that it was a participant in Plaintiffs' and Class Members' communications about their Private Information on its Webpage, because it used its participation in these communications to improperly share Plaintiffs' and Class Members' Private Information with Facebook and third-parties that did not participate in these communications, that Plaintiffs and Class Members did not know was receiving their information, and that Plaintiffs and Class Members did not consent to receive this information

290.   As such, Defendant cannot viably claim any exception to ECPA liability.

291.   Plaintiffs and Class Members have suffered damages as a direct and proximate result of Defendant's invasion of privacy in that:

65

a.  Learning that Defendant has intruded upon, intercepted, transmitted, shared, and used their PII and PHI (including information about their medical symptoms, conditions, and concerns, medical appointments, healthcare providers and locations, medications and treatments, and health insurance and medical bills) for commercial purposes has caused Plaintiffs and the Class Members to suffer emotional distress;

b.  Defendant received substantial financial benefits from its use of Plaintiffs' and the Class Members' PII and PHI without providing any value or benefit to Plaintiffs or the Class Members;

c.  Defendant received substantial, quantifiable value from its use of Plaintiffs' and the Class Members' PII and PHI, such as understanding how people use its web properties and determining what ads people see on its web properties, without providing any value or benefit to Plaintiffs or the Class Members;

d.  Defendant has failed to provide Plaintiffs and the Class Members with the full value of the medical services for which they paid, which included a duty to maintain the confidentiality of their patient information; and

e.  The diminution in value of Plaintiffs' and Class Members' PII and PHI and the loss of privacy due to Defendant making sensitive and confidential information, such as patient status, medical treatment, and appointments that Plaintiffs and Class Members intended to remain private no longer private.

292.  Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Pixel to track and utilize Plaintiffs' and Class Members' Private Information for financial gain.

293.  Defendant was not acting under color of law to intercept Plaintiffs' and the Class Members' wire or electronic communication.

294.  Plaintiffs and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading their privacy via the Pixel.

66

295.   Any purported consent that Defendant received from Plaintiffs and Class Members was not valid.

296.   In sending and in acquiring the content of Plaintiffs' and Class Members' sensitive communications relating to the browsing of Defendant's Website, Defendant's purpose was tortious, criminal, and designed to violate federal and state legal provisions including a knowing intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable person.

297.   As a result of Defendant's violation of the ECPA, Plaintiffs and the Class are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

## COUNT V

### VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT
### Cal. Penal Code §§ 630, *et. seq*.
### (*On behalf of Plaintiff R.C. & the California Subclass*)

298.   Plaintiff R.C. repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the proposed California Subclass.

299.   The California Invasion of Privacy Act is codified at Cal. Penal Code §§ 630 to 638 ("CIPA").

300.   The Act begins with its statement of purpose.

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

67

Cal. Penal Code § 630.

301.  California Penal Code § 631(a) provides, in pertinent part:

> Any person who, by means of any machine, instrument, or contrivance, or in any other manner … willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or **who aids, agrees with, employs, or conspires** with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500).

(emphasis added).

302.  Thus, a defendant must show that it had the consent of <u>all</u> parties to a communication.

303.  At all relevant times, Defendant is and has been a "person" under CIPA, Cal. Penal Code § 631(a).

304.  At all relevant times, Defendant aided, employed, agreed with, and conspired with third parties like Facebook to track and to intercept Plaintiff R.C.'s and Subclass Members' internet communications while accessing the Digital Platforms.

305.  These communications were transmitted to and intercepted by a third party during the communications and without the knowledge, authorization, or consent of Plaintiff R.C. and Subclass Members.

306.  Defendant intentionally implemented electronic technology into its Digital Platforms that, without the knowledge and consent of Plaintiffs and Subclass

Members, tracked and transmitted the substance of their confidential communications with Defendant to a third party.

307. Defendant willingly facilitated Facebook's and others' interception and collection of Plaintiff R.C.'s and Subclass Members' Private Information by embedding the Pixel and other tracking technologies on its Digital Platforms. Defendant has full control over the Pixel, including which webpages contain the Pixel, what information is tracked and transmitted via the Pixel, and how events are categorized prior to their transmission.

308. The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA:

 a. The computer codes and programs Defendant used to track Plaintiff R.C.'s and Subclass Members' communications while they were navigating the Digital Platforms;

 b. Plaintiff R.C.'s and Subclass Members' browsers;

 c. Plaintiff R.C.'s and Subclass Members' computing and mobile devices;

 d. Defendant's web and ad servers;

 e. The web and ad-servers from which Third Parties tracked and intercepted Plaintiff R.C.'s and Subclass Members' communications while they were using a web browser to access or navigate the Digital Platforms;

 f. The computer codes and programs used by third parties to effectuate the tracking and interception of Plaintiff R.C.'s and Subclass Members' communications while they were using a browser to visit Defendant's Digital Platforms; and

 g. The plan Defendant and others carried out to effectuate its tracking and interception of Plaintiff R.C.'s and Subclass Members' communications while they were using a web browser or mobile application to visit Defendant's Digital Platforms.

309.   Based on these categories, the Pixel qualifies as a "machine[s], instrument[s], or contrivance[s]." At the very least, the Pixel falls under the broad catch-all category of "any other manner."

310.   Defendant does not disclose that it is using Pixels specifically to track and automatically and simultaneously transmit communications to a third party.

311.   Defendant is aware that these communications are confidential as its Privacy Policy and representations acknowledge the confidential nature of private medical information and disclaim that it is being shared with unidentified third parties without Plaintiff R.C.'s and Subclass Members' express authorization.

312.   The patient communication information that Defendant transmits while using Pixels constitutes protected health information.

313.   By design, the Pixel transmits each of the user's actions taken on the webpage to a third party alongside and contemporaneously with the user initiating the communication.

314.   Thus, user communication is intercepted in transit to the intended recipient—Defendant—before it reaches Defendant's server.

315.   As demonstrated hereinabove, Defendant violates CIPA by aiding and permitting third parties to receive its patients' online communications in real time through its Digital Platforms without their consent.

316.   Plaintiff R.C.'s and Subclass Members' Private Information was viewed and analyzed by Meta for the purpose of serving targeted ads to Plaintiff R.C. and the Subclass Members.

317.   The wrongful conduct at issue took place in the State of California.

318.   By disclosing Plaintiff R.C.'s and Subclass Members' Private Information, Defendant violated Plaintiff R.C.'s and Subclass Members' statutorily protected right to privacy.

319.   As a result of the above violations and pursuant to CIPA Section 637.2, Defendant is liable to Plaintiff R.C. and Subclass Members for the greater of: a)

70

treble actual damages related to their loss of privacy in an amount to be determined at trial, or b) or for statutory damages in the amount of $5,000 per violation.

320.   Cal. Penal Code Section 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages."

321.   Under the statute, Defendant is also liable for reasonable attorney fees, litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Defendant in the future.

322.

## COUNT VI

### VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW ("UCL")
### Cal. Bus. & Prof. Code § 17200, *et seq*. – Unlawful and Fraudulent Business Practices
### (*On Behalf of Plaintiff R.C. & the California Subclass*)

323.   Plaintiff R.C. repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the proposed California Subclass.

324.   Plaintiff R.C., Subclass Members, and Defendant are each a "person" under Cal. Bus. & Prof. Code § 17201.

325.   The acts, omissions, and conduct of Defendant as alleged herein constitute "business practices" within the meaning of the UCL.

326.   California Business and Professions Code §§ 17201, et seq. prohibits acts of unfair competition, which includes unlawful business practices.

327.   Plaintiff R.C. brings her claims for injunctive relief as she has no confidence that Defendant has altered its privacy practices and she may wish to use Defendant's services in the future.

71

328.   Plaintiff R.C. brings her claims for restitution in the alternative to their claims for damages.

329.   Defendant's business acts and practices are "unlawful" under the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et. seq.* because, as alleged above, Defendant violated California common law, the California Constitution, and other statutes and causes of action alleged herein.

330.   Defendant engaged in unlawful business practices by disclosing Plaintiff R.C.'s and Subclass Members' Private Information to unrelated third parties, including Facebook, by imbedding the Pixel on its Digital Platforms without prior consent in violation of the consumer protection and privacy statutes alleged herein, including the following: California Constitution, Article I, section 1; Cal. Penal Code §§ 630, *et. seq.*; Cal. Civ. Code §§ 56, *et. seq.*; 18 U.S.C. § 2511(1), *et seq.*; 18 U.S.C. § 2511(3)(a), *et seq.*; Section 5 of the FTC Act, 15 U.S.C 45, et seq.; and the HIPAA violations set forth above.

331.   Because Defendant is in the business of providing healthcare services, Plaintiff R.C. and Subclass Members relied on Defendant to advise them of any potential disclosure of their Private Information. Plaintiff R.C. and Subclass Members understood that Defendant, as a healthcare provider, would take appropriate measures to keep their Private Information private and confidential.

332.   In its privacy policies, Defendant promised that it would not share Plaintiff R.C.'s and Subclass Members' Private Information with any third party without consent or for marketing purposes. Contrary to its own policies, Walgreens did disclose Plaintiff R.C.'s and Subclass Members' Private Information to third parties without consent and for marketing purposes.

333.   Had Defendant disclosed that it shared Private Information with third parties, Plaintiff R.C. would have been aware of the disclosure, and would not have used Defendant's services or would have paid considerably less for those services.

334.   As a direct and proximate result of Defendant's violations of the UCL,

Plaintiff R.C. and Subclass Members have suffered injury in fact and lost money or property, including, but not limited to, payments Plaintiff R.C. and Subclass Members made to Defendant and/or other valuable consideration, in addition to the exposure of their Private Information. Plaintiff R.C. and Subclass Members also lost the value of their Private Information because of Defendant's unlawful disclosures.

335.   Plaintiff R.C. and Subclass Members also face a real and immediate threat of future injury to the confidentiality of their Private Information because such information remains within Defendant's control and because anytime that Plaintiff R.C. and Subclass Members interact with the Digital Platforms to submit information about their medical conditions, seek treatments, or otherwise seek assistance related to their medical conditions, Plaintiff R.C. and Subclass Members risk further disclosure of their Private Information. Plaintiff R.C. continues to want to use Walgreens' Digital Platforms and would resume using Walgreens' services if Walgreens complies with applicable laws and stops using the Pixel on its Digital Platforms. Plaintiff R.C. and Subclass Members are, therefore, entitled to injunctive relief, requiring that Defendant cease all website operations that allow for the third-party capture of Private Health Information.

336.   As a direct result of its unlawful and deceptive practices, Defendant has been unjustly enriched and should be required to make restitution to Plaintiff R.C. and to Subclass Members pursuant to §§ 17203 and 17204 of the California Business & Professions Code, restitutionary disgorgement of all profits accruing to Defendant because of its unlawful business practices, declaratory relief, attorney fees, and costs of litigation (pursuant to Cal. Code Civ. Proc. §1021.5), and injunctive or other equitable relief.

337.   In the alternative to those claims seeking remedies at law, Plaintiff R.C. and Subclass Members allege that there is no plain, adequate, and complete remedy that exists at law to address Defendant's unlawful and unfair business practices.

338.   The legal remedies available to Plaintiff R.C. are inadequate because

73

they are not "equally prompt and certain and in other ways efficient" as equitable relief. *American Life Ins. Co. v. Stewart*, 300 U.S. 203, 214 (1937); *see also United States v. Bluitt*, 815 F. Supp. 1314, 1317 (N.D. Cal. Oct. 6, 1992) ("The mere existence' of a possible legal remedy is not sufficient to warrant denial of equitable relief.").

339.    Additionally, unlike damages, the Court's discretion in fashioning equitable relief is very broad and can be awarded in situations where the entitlement to damages may prove difficult. *Cortez v. Purolator Air Filtration Products Co.*, 23 Cal.4th 163, 177-180 (2000) (Restitution under the UCL can be awarded "even absent individualized proof that the claimant lacked knowledge of the overcharge when the transaction occurred.").

340.    Thus, restitution would allow recovery even when normal consideration associated with damages would not. *See, e.g., Fladeboe v. Am. Isuzu Motors Inc.*, 150 Cal. App. 4th 42, 68 (2007) (noting that restitution is available even in situations where damages may not be available). Furthermore, the standard for a violation of the UCL "unlawful" prong is different from the standard that governs legal claims.

## COUNT VII

**VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW
Cal. Bus. & Prof. Code § 17200, *et seq*.- Unfair Business Practices
(*On behalf of Plaintiff R.C. & the California Subclass*)**

341.    Plaintiff R.C. repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the proposed California Subclass.

342.    Defendant's business acts and practices meet the unfairness prong of the UCL according to all three theories of unfairness.

343.    First, Defendant's business acts and practices are "unfair" under the UCL pursuant to the three-part test articulated in *Camacho v. Automobile Club of*

74

*Southern California* (2006) 142 Cal. App. 4th 1394, 1403: (a) Plaintiff R.C. and
Subclass Members suffered substantial injury due to Defendant's disclosure of their
Private Information; (b) Defendant's disclosure of Plaintiff R.C.'s and Class
Members' Private Information provides no benefit to consumers, let alone any
countervailing benefit that could justify Defendant's disclosure of Private
Information without consent for marketing purposes or other pecuniary gain; and (c)
Plaintiff R.C. and Subclass Members could not have readily avoided this injury
because they had no way of knowing that Defendant was implementing the Pixel.
Thus, Plaintiff R.C. and Subclass Members did not know to ask Defendant to stop
the practice of disclosing their Private Information and did not know that they should
stop using Defendant's services to avoid disclosing their Private Information.

344.    Second, Defendant's business acts and practices are "unfair" under the
UCL because they are "immoral, unethical, oppressive, unscrupulous, or
substantially injurious" to Plaintiff R.C. and Subclass Members, and "the utility of
[Defendant's] conduct," if any, does not "outweigh the gravity of the harm" to
Plaintiff R.C. and Subclass Members. *Drum v. San Fernando Valley Bar Ass'n*,
(2010) 182 Cal. App. 4th 247, 257. Defendant engaged in unfair business practices
by disclosing Plaintiff R.C.'s and Subclass Members' Private Information to
unrelated third parties, including Facebook, without prior consent despite its
promises to keep such information confidential. This surreptitious and undisclosed
conduct is immoral, unethical, oppressive, unscrupulous, and substantially injurious.
No benefit inheres in this conduct, the gravity of which is significant.

345.    Third, Defendant's business acts and practices are "unfair" under the
UCL because they run afoul of "specific constitutional, statutory, or regulatory
provisions." *Drum*, 182 Cal. App. 4th at 256 (internal quotation marks and citations
omitted). California has a strong public policy of protecting consumers' privacy
interests, including consumers' and patients' personal data. This public policy is
codified in California's Constitution in Article I, section 1; CIPA, Cal. Penal Code

§§ 630, *et seq*.; and the California Consumer Privacy Act, Cal. Civil Code §§ 1798, *et seq.*, among other statutes.

346.   This public policy is further codified on a nationwide basis in federal statutes, including HIPAA, FTC Act, and the ECPA. Defendant violated this public policy by, among other things, surreptitiously collecting, disclosing, and otherwise exploiting Plaintiff R.C.'s and Subclass Members' Private Information by sharing it with Facebook and other third parties via the Pixel without Plaintiff R.C.'s and/or Class Members' consent.

347.   Because Defendant is in the business of providing healthcare services, Plaintiff R.C. and Subclass Members relied on Defendant to advise them of any potential disclosure of their Private Information.

348.   Plaintiff R.C. and Subclass Members understood that Defendant, as a healthcare provider, would take appropriate measures to keep their private information private and confidential.

349.   In its privacy policies, Defendant promised that it would not share Plaintiff R.C.'s and Subclass Members' private information with any third party without consent or for marketing purposes. Contrary to its own policies, Walgreens did disclose Plaintiff R.C.'s and Subclass Members' Private Information to third parties without consent and for marketing purposes. Defendant was in sole possession of and had a duty to disclose the material information that Plaintiff R.C.'s and Subclass Members' Private Information was being shared with a third party.

350.   Had Defendant disclosed that it shared Private Information with third parties, Plaintiff R.C. would not have used Defendant's services or would have paid considerably less for those services.

351.   The harm caused by the Defendant's conduct outweighs any potential benefits attributable to such conduct and there were reasonably available alternatives to further Defendant's legitimate business interests other than Defendant's conduct described herein.

352.  Plaintiff R.C. and Subclass Members trusted Defendant to keep their Private Information confidential, and as a result, shared highly sensitive information through their use of the Digital Platforms, causing them to suffer damages when Defendant disclosed that information to a third party.

353.  As a direct and proximate result of Defendant's violations of the UCL, Plaintiff R.C. and Subclass Members have suffered injury in fact and lost money or property, including, but not limited to, payments Plaintiff R.C. and Subclass Members made to Defendant and/or other valuable consideration, such as access to their private and personal data. Plaintiff R.C. and Subclass Members also lost the value of their Private Information as a result of Defendant's unfair business practices.

354.  As a direct result of its unfair practices, Defendant has been unjustly enriched and should be required to make restitution to Plaintiff R.C. and Subclass Members pursuant to §§ 17203 and 17204 of the California Business & Professions Code, restitutionary disgorgement of all profits accruing to Defendant because of its unlawful business practices, declaratory relief, attorney fees and costs (pursuant to Cal. Code Civ. Proc. §1021.5), and injunctive or other equitable relief.

355.  In the alternative to those claims seeking remedies at law, Plaintiff R.C. and Subclass Members allege that there is no plain, adequate, and complete remedy that exists at law to address Defendant's unlawful and unfair business practices. The legal remedies available to Plaintiff R.C. are inadequate because they are not "equally prompt and certain and in other ways efficient" as equitable relief. *American Life Ins. Co. v. Stewart*, 300 U.S. 203, 214 (1937); *see also United States v. Bluitt*, 815 F. Supp. 1314, 1317 (N.D. Cal. Oct. 6, 1992) ("The mere existence' of a possible legal remedy is not sufficient to warrant denial of equitable relief.").

356.  Additionally, unlike damages, the Court's discretion in fashioning equitable relief is very broad and can be awarded in situations where the entitlement to damages may prove difficult. *Cortez v. Purolator Air Filtration Products Co.*, 23

77

Cal.4th 163, 177-180 (2000) (Restitution under the UCL can be awarded "even absent individualized proof that the claimant lacked knowledge of the overcharge when the transaction occurred.").

357.    Thus, restitution would allow recovery even when normal consideration associated with damages would not. *See, e.g., Fladeboe v. Am. Isuzu Motors Inc.*, 150 Cal. App. 4th 42, 68 (2007) (noting that restitution is available even in situations where damages may not be available). Furthermore, the standard for a violation of the UCL "unfair" prong is different from the standard that governs legal claims.

## COUNT VIII

### VIOLATION OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT, Cal. Civ. Code § 1750, *et seq*. ("CLRA") (*On behalf of Plaintiff R.C. & the California Subclass*)

358.    Plaintiff R.C. repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the proposed California Subclass.

359.    Defendant Walgreens engaged in "unfair methods of competition and unfair or deceptive acts . . . in a transaction . . . that result[ed] . . . in the sale . . . of goods" to Plaintiff R.C. and the Class Members in violation of Cal. Civ. Code § 1750 and Cal. Civ. Code § 1770(a)(5), (7), (9), (14), (16).

360.    For instance, Defendant made representations that it would protect Plaintiff R.C.'s and the California Subclass Members' privacy interest, including promising that it will keep Private Information private and secure, that Defendant does not sell Users' pharmacy information, and that it will only disclose Private Information under certain circumstances, none of which was true.

361.    Defendant Walgreens made these representations with no intention of living up to these representations. Contrary to these representations, Defendant

Walgreens disclosed and allowed third parties to intercept its customers' Private Information.

362.   Further, Defendant Walgreens failed to disclose it secretly shared, used, and allowed third parties to intercept Plaintiff R.C.'s and Subclass Members' Private Information.

363.   Defendant Walgreens was under a duty to disclose this information given Defendant's relationship with its customers and Defendant's exclusive knowledge of its misconduct (e.g., the tracking technology incorporated on Defendant's Website, the fact that Private Information is disclosed to unauthorized third parties, that Defendant allowed third parties to intercept Private Information through this technology, and how Defendant and third parties used this data).

364.   Plaintiff R.C. and Subclass Members would not have purchased, or would have paid significantly less for, Defendant Walgreens services and products had Defendant Walgreens not made these false representations. Defendant Walgreens profited directly from these sales, including through payment for these services and products, and from the Private Information disclosed and intercepted.

365.   Plaintiff R.C., individually and on behalf of the Subclass Members, seeks an injunction requiring Defendant Walgreens to obtain consent prior to disclosing and otherwise using Plaintiff R.C.'s and Subclass Members' Private Information and to delete the Private Information already collected, and any other relief which the court deems proper.

366.   Pursuant to Cal. Civ. Code § 1782(a), Plaintiff R.C. served Defendant Walgreens with notice of its alleged violations of the CLRA by certified mail return receipt requested contemporaneously with the filing of the Original Complaint. Defendant Walgreens failed to provide appropriate relief for its violations of the CLRA within 30 days. Therefore, Plaintiff R.C., on behalf of herself and on behalf of the California Subclass, seeks monetary damages under the CLRA.

367.   In accordance with Cal. Civ. Code § 1780(d), Plaintiff R.C.'s CLRA

79

venue declaration is filed concurrently with this Second Amended Complaint.

## COUNT IX
### VIRGINIA CONSUMER PROTECTION ACT
### Va. Code. Ann. §§ 159.1-196, *et seq*.
### *(On Behalf of Plaintiff T.S. and the Virginia Subclass)*

368.    Plaintiff T.S. repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the proposed Virginia Subclass.

369.    The Virginia Consumer Protection Act prohibits "[u]sing any . . . deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction." Va. Code Ann. § 59.1-200(14).

370.    Defendant is a "person" as defined by Va. Code Ann. § 59.1-198.

371.    Defendant is a "supplier," as defined by Va. Code Ann. § 59.1-198.

372.    Defendant engaged in the complained-of conduct in connection with "consumer transactions" with regard to "goods" and "services," as defined by Va. Code Ann. § 59.1-198. Defendant advertised, offered, or sold goods or services used primarily for personal, family or household purposes.

373.    Defendant engaged in deceptive acts and practices by using deception, fraud, false pretense, false promise, and misrepresentation in connection with consumer transactions, including:

      a. Defendant disclosed Plaintiff T.S.'s and Subclass Members' Private Information to unrelated third parties, including Facebook, without prior consent despite its promises to keep such information confidential. This surreptitious and undisclosed conduct is immoral, unethical, oppressive, unscrupulous, and substantially injurious. No benefit inheres in this conduct, the gravity of which is significant;

      b. Virginia has a strong public policy of protecting consumers' privacy interests, including consumers' and patients' personal data, codified,

    

*inter alia*, in the Virginia Consumer Protection Act. This public policy is further codified on a nationwide basis in federal statutes, including HIPAA, FTC Act, and the ECPA. Defendant violated this public policy by, among other things, surreptitiously collecting, disclosing, and otherwise exploiting Plaintiff T.S.'s and Subclass Members' Private Information by sharing it with Facebook and other third parties via the Pixel without Plaintiff T.S.'s and/or Virginia Subclass Members' consent;

c.  Defendant failed to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff T.S.'s and Virginia Subclass Members' Private Information, including duties imposed by HIPAA, the FTC Act, and the ECPA, which was a direct and proximate cause of the harm suffered by T.S. and Virginia Subclass Members;

d.  Defendant misrepresented that it would protect the privacy and confidentiality of Plaintiff T.S.'s and Virginia Subclass members' Private Information;

e.  Defendant misrepresented that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff T.S.'s and Virginia Subclass Members' PII, including duties imposed by HIPAA, the FTC Act, and the ECPA;

f.  Defendant omitted, suppressed, and concealed the material fact that it did not reasonably or adequately secure Plaintiff's and Class members' Private Information; and

g.  Defendant omitted, suppressed, and concealed the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class members' PII, including duties imposed by HIPAA, the FTC Act, and the ECPA.

81

374. Defendant intended to mislead Plaintiff T.S and Virginia Subclass Members and induce them to rely on its misrepresentations and omissions.

375. Defendant's representations and omissions were material because they were likely to deceive reasonable consumers, including Plaintiff T.S. and Virginia Subclass Members, about the adequacy of Defendant's computer and data security and the quality of the Defendant brand.

376. Because Defendant is in the business of providing healthcare services, Plaintiff T.S. and Subclass Members relied on Defendant to advise them of any potential disclosure of their Private Information.

377. Plaintiff T.S. and Subclass Members understood that Defendant, as a healthcare provider, would take appropriate measures to keep their private information private and confidential.

378. In its privacy policies, Defendant promised that it would not share Plaintiff T.S.'s and Subclass Members' private information with any third party without consent or for marketing purposes. Contrary to its own policies, Walgreens did disclose Plaintiff T.S.'s and Subclass Members' Private Information to third parties without consent and for marketing purposes. Defendant was in sole possession of and had a duty to disclose the material information that Plaintiff T.S.'s and Subclass Members' Private Information was being shared with a third party.

379. Had Defendant disclosed that it shared Private Information with third parties, Plaintiff T.S. would not have used Defendant's services or would have paid considerably less for those services.

380. Defendant was trusted with sensitive and valuable Private Information regarding millions of consumers, including Plaintiff T.S. and the Subclass. Defendant accepted the responsibility of protecting the data while keeping its unauthorized disclosure of the date to Facebook and other third parties secret from the public. Accordingly, Plaintiff and the Class Members acted reasonably in relying on Defendant's misrepresentations and omissions, the truth of which they could not

82

have discovered.

381.   The harm caused by the Defendant's conduct outweighs any potential benefits attributable to such conduct and there were reasonably available alternatives to further Defendant's legitimate business interests other than Defendant's conduct described herein.

382.   Plaintiff T.S. and Subclass Members trusted Defendant to keep their Private Information confidential, and as a result, shared highly sensitive information through their use of the Digital Platforms, causing them to suffer damages when Defendant disclosed that information to a third party.

383.   Defendant had a duty to disclose that it was permitting third parties to intercept Plaintiff T.S.'s and Subclass Members' Private Information without their consent, due to the circumstances of this case, the sensitivity and extensivity of the Private Information in its possession, and the generally accepted professional standards. Such a duty is implied by law due to the nature of the relationship between consumers including Plaintiff T.S. and the Subclass – and Defendant, because consumers are unable to fully protect their interests with regard to their data, and placed trust and confidence in Defendant. Defendant's duty to disclose also arose from its:

   a. Possession of exclusive knowledge regarding the security and privacy of the data in its systems;
   b. Active concealment of the state of its security or privacy practices; and/or
   c. Incomplete representations about the security and integrity of its computer and data systems, while purposefully withholding material facts from Plaintiff T.S. and the Subclass that contradicted these representations.

384.   The above-described deceptive acts and practices also violated the following provisions of VA Code § 59.1-200(A):

   a. Misrepresenting that goods or services have certain characteristics, uses, or benefits;

83

b.  Misrepresenting that goods or services are of a particular standard, quality, grade, style, or model; and

c.  Advertising goods or services with intent not to sell them as advertised, or with intent not to sell them upon the terms advertised;

d.  Using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction.

385.    Defendant acted intentionally, knowingly, and maliciously to violate Virginia's Consumer Protection Act, and recklessly disregarded Plaintiff T.S.'s and Class Members' rights. An award of punitive damages would serve to punish Defendant for its wrongdoing, and warn or deter others from engaging in similar conduct.

386.    As a direct and proximate result of Defendant's deceptive acts or practices, Plaintiff T.S. and Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, as described herein, including but not limited to: loss of value of their Private Information; overpayment for Defendant's services; and loss of the value of access to their Private Information.

387.    Defendant's violations present a continuing risk to Plaintiff T.S. and Subclass Members as well as to the general public.

388.    Plaintiff T.S. and Subclass Members seek all monetary and non-monetary relief allowed by law, including actual damages; statutory damages in the amount of $1,000 per violation if the conduct is found to be willful or, in the alternative, $500 per violation; restitution, injunctive relief; punitive damages; and attorneys' fees and costs.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and other Class Members, prays for judgment against Defendant as follows:

A.    an Order certifying the Nationwide Class and California

84

Subclass, and appointing the Plaintiffs and their Counsel to represent the Classes;

B.      equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Private Information of Plaintiffs and Class Members;

C.      injunctive relief requested by Plaintiffs, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members;

D.      an award of all damages available at equity or law, including, but not limited to, actual, consequential, punitive, statutory and nominal damages, as allowed by law in an amount to be determined;

E.      an award of attorney fees, costs, and litigation expenses, as allowed by law;

F.      prejudgment interest on all amounts awarded and

G.      all such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs, on behalf of themselves and other members of the proposed Classes, hereby demand a jury trial on all issues so triable.

Dated: December 8, 2023                Respectfully Submitted,

                                        */s/ John R. Parker, Jr.*
                                        John R. Parker, Jr.
                                        California Bar No. 257761
                                        **ALMEIDA LAW GROUP LLC**
                                        3550 Watt Avenue, Suite 140
                                        Sacramento, California 95821
                                        Tel: (916) 616-2936

85

jrparker@almeidalawgroup.com

David S. Almeida*
Elena A. Belov*
**ALMEIDA LAW GROUP LLC**
849 W Webster Avenue
Chicago, IL 60614
Tel: (312) 576-3024
david@almeidalawgroup.com
elena@almeidalawgroup.com

Brandon M. Wise*
**PEIFFER WOLF CARR KANE
CONWAY & WISE LLP**
818 Lafayette Ave., Floor 2
St. Louis, MO 63104
Tel: (314) 833-4825
bwise@peifferwolf.com

Andrew R. Tate*
**PEIFFER WOLF CARR KANE
CONWAY & WISE LLP**
235 Peachtree St. NE, Suite 400
Atlanta, GA 30303
Tel: (314) 669-3600
atate@peifferwolf.com

Melisa A. Rosadini-Knott
California Bar No. 316369
**PEIFFER WOLF CARR KANE
CONWAY & WISE LLP**
3435 Wilshire Blvd. Ste 1400
Los Angeles, CA 90010-1923
323-982-4109
rosadini@peifferwolf.com

*Attorneys for Plaintiffs & the Putative
Classes*

*\* Pro Hac Vice pending*

SECOND AMENDED CLASS ACTION COMPLAINT                    CASE NO. 5:23-cv-01933-JGB-SP