UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 23-1933 JGB (SPx)** | Date | May 9, 2024 |
|---|---|---|---|
| Title | *R.C. v. Walgreen Co.* | | |

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:**    **Order (1) GRANTING IN PART Defendant's Motion to Dismiss (Dkt. No. 44); and (2) VACATING the May 13, 2024 Hearing (IN CHAMBERS)**

Before the Court is defendant Walgreen Co. d/b/a Walgreens's ("Walgreens" or "Defendant") motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6). ("Motion," Dkt. No. 44.)  The Court determines this matter appropriate for resolution without a hearing.  See Fed. R. Civ. P. 78; L.R. 7-15.  After considering the papers filed in support of and in opposition to the Motion, the Court **GRANTS IN PART** the Motion.  The Court **VACATES** the May 13, 2024 hearing.

## I.  BACKGROUND

On September 21, 2023, plaintiffs R.C. and T.S. (collectively, "Plaintiffs") individually, and on behalf of all others similarly situated, filed a complaint against Defendant.  ("Complaint," Dkt. No. 1.)  The Complaint alleged fourteen causes of action: (1) common law invasion of privacy – intrusion upon seclusion; (2) breach of confidence; (3) breach of fiduciary duty; (4) negligence; (5) breach of implied contract; (6) breach of implied covenant of good faith and fair dealing; (7) unjust enrichment; (8) violations of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511(1), et seq.; (9) violations of California Invasion of Privacy Act, Cal. Penal Code § 630, et seq. ("CIPA"); (10) violations of California Confidentiality of Medical Information Act, Cal. Civ. Code § 56, et seq. ("CMIA"); (11) invasion of privacy under the California Constitution, Cal. Const. Art. 1 § 1; (12) violations of the California Unfair Competition Law, Cal. Bus. & Prof. Code, § 17200, et seq. ("UCL"), for unlawful and fraudulent business practices; (13) violations of the UCL for unfair business practices; and (14)

violations of the California Consumers Legal Remedies Act, Cal. Civ. Code § 1750, <u>et seq.</u>
("CLRA").  (<u>See</u> Complaint.)

On October 27, 2023, Plaintiffs filed a First Amended Complaint alleging fourteen causes
of action: (1) common law invasion of privacy – intrusion upon seclusion; (2) breach of
confidence; (3) breach of fiduciary duty; (4) negligence; (5) breach of implied contract; (6)
breach of implied covenant of good faith and fair dealing; (7) unjust enrichment; (8) violations of
ECPA, 18 U.S.C. § 2511(1), <u>et seq.</u>; (9) violations of CIPA, Cal. Penal Code § 630, <u>et seq.</u>; (10)
invasion of privacy under the California Constitution, Cal. Const. Art. 1 § 1; (11) violations of the
California UCL, Cal. Bus. & Prof. Code, § 17200, <u>et seq.</u>, for unlawful and fraudulent business
practices; (12) violation of the UCL for unfair business practices; (13) violations of CLRA, Cal.
Civ. Code § 1750, <u>et seq.</u>; and (14) violations of the Virginia Consumer Protection Act, Va. Code.
Ann. §§ 159.1-196, <u>et seq.</u>  (<u>See</u> "FAC," Dkt. No. 19.)  Defendant moved to dismiss the FAC;
that motion to dismiss was mooted by Plaintiffs filing their Second Amended Complaint, as
stipulated between the parties.  (<u>See</u> Dkt. No. 37.)

On December 8, 2023, Plaintiffs filed their Second Amended Complaint.  (<u>See</u> "SAC,"
Dkt. No. 38.)  The SAC alleges nine causes of action: (1) common law invasion of privacy –
intrusion upon seclusion; (2) negligence; (3) unjust enrichment; (4) ECPA violations; (5) CIPA
violations; (6) violations of the California UCL for unlawful and fraudulent business practices;
(7) violations of the California UCL for unfair business practices; (8) CLRA violations; and (9)
violation of the Virginia Consumer Protection Act.  (<u>See</u> <u>id.</u>)

On January 19, 2024, Defendant moved to dismiss the SAC pursuant to Federal Rule of
Civil Procedure 12(b)(6).[1]  (<u>See</u> Motion.)  Defendant also filed a Request for Judicial Notice.[2]

---

[1] All subsequent references to "Rule" refer to the Federal Rules of Civil Procedure,
unless otherwise noted.

[2] Defendant requests judicial notice of one document: a printout of the Online Privacy
and Security Policy webpage from Walgreens's website (the "Privacy Policy") dated November
13, 2023.  (RJN, Ex. A.)  "In deciding a Rule 12(b)(6) motion, the court generally looks only to
the face of the complaint and documents attached thereto."  <u>Gerritsen v. Warner Bros. Ent. Inc.</u>,
112 F. Supp. 3d 1011, 1019 (C.D. Cal. 2015).  In addition, a court may consider certain materials,
including documents incorporated by reference in the complaint, or other matters of judicial
notice.  <u>United States v. Ritchie</u>, 342 F.3d 903, 908 (9th Cir. 2003).  The incorporation by
reference doctrine applies where "the plaintiff's claim depends on the contents of a document,
the defendant attaches the document to its motion to dismiss, and the parties do not dispute the
authenticity of the document, even though the plaintiff does not explicitly allege the contents of
that document in the complaint."  <u>Knievel v. ESPN</u>, 393 F.3d 1068, 1076 (9th Cir. 2005).  The
Court need not assume the truth of alleged facts that are contradicted by those of which the
Court has taken judicial notice.  <u>See</u> <u>Mullis v. U.S. Bankr. Court</u>, 828 F.2d 1385, 1388 (9th Cir.
1987).  Here, the Privacy Policy is incorporated into the SAC by virtue of the SAC's references to
the website's privacy policies.  (<u>See, e.g.</u>, SAC ¶¶ 95–98.)  Since it is incorporated by reference
and its authenticity is not disputed, the Court **GRANTS** the RJN and takes judicial notice of the

---

("RJN," Dkt. No. 45.)  On February 9, 2024, Plaintiffs opposed the Motion.  ("Opposition," Dkt. No. 46.)  On February 23, 2024, Defendant filed its reply.  ("Reply," Dkt. No. 48.)

## II.   FACTUAL ALLEGATIONS

Plaintiffs allege the following facts, which are assumed to be true for the purposes of this Motion.  See Am. Fam. Ass'n, Inc. v. City & Cnty. of San Francisco, 277 F.3d 1114, 1120 (9th Cir. 2002).

Defendant Walgreen Co. is an Illinois Corporation, headquartered in Illinois, and doing business as Walgreens throughout the United States.  (SAC ¶ 42.)  Defendant maintained and operated a website (www.walgreens.com) by and through which Defendant encouraged and permitted consumers to seek healthcare products.  (Id. ¶ 52.)  To purchase sensitive healthcare products, Plaintiffs and other class members were required to search for and to add the healthcare products to their virtual cart before proceeding to checkout.  (Id. ¶ 53.)  When interacting with Walgreens's Digital Platforms in this manner, Plaintiffs and class members convey highly private and sensitive information to Walgreens.  (Id. ¶ 64.)  Defendant intentionally configured tracking pixels installed on its website to capture both the "characteristics" of individual patients' communications with the Defendant's websites (e.g., their IP addresses, Facebook ID, cookie identifiers, device identifiers and account numbers) and the "content" of these communications (i.e., the buttons, links, pages, and tabs they click and view, as well as search terms entered into free text boxes and descriptive URLs showing the information being exchanged).  (Id. ¶ 68.)  One such tracking pixel is the Meta Pixel, which is a marketing product offered by Facebook that is comprised of a piece of code that allows Defendant to understand the effectiveness of their advertising and the actions patients take on their site, optimize the delivery of ads, measure cross-device conversions, create custom advertising groups, learn about the use of its website, and decrease advertising and marketing costs.  (Id. ¶¶ 74, 78.)  Defendant also deposits cookies named _fbp, _ga_, and _gid onto Plaintiffs' and class members' computing devices.  (Id. ¶ 70.)  These cookies are associated with the third-parties Facebook and Google, but Defendant deposits them on Plaintiffs' and class members' computing devices by disguising them as first-party cookies.  (Id.)

Without any action or authorization, Defendant commands Plaintiffs' and class members' computing devices to contemporaneously re-direct the Plaintiffs' and class members' identifiers and the content of their communications to Facebook and Google.  (Id.)  And if the website visitor is also a Facebook user, the information Facebook receives is linked to the visitor's Facebook profile (via their Facebook ID or "c_user id"), which includes other identifying information.  (Id. 71.)  Defendant intentionally configured the Meta Pixel on its website to track, collect, and disclose "custom events" such as the name of the sensitive healthcare products including Plan B, HIV tests, pregnancy tests, prenatal vitamins, hyperglycemic/hypoglycemic management products and numerous other products to diagnose and/or treat highly sensitive and

---

Privacy Policy.  See Knievel, 393 F.3d at 1076; Shalikar v. Asahi Beer U.S.A., Inc., 2017 WL 9362139, *2 (C.D. Cal. Oct. 16, 2017).

private conditions that a customer was seeking to purchase, and the fact that the customer was purchasing these sensitive healthcare products. (Id. ¶ 90.) The Meta Pixel on Defendant's website was also intentionally configured or authorized to use a feature called "automatic advanced matching," which scans forms on a website to identify fields that may contain personally identifiable information like a first name, last name, or email address, and then causes that information to be disclosed to Meta. (Id. ¶ 91.) On Defendant's website this feature collected, at a minimum, the first names and last names of Plaintiffs and other class members as displayed on the checkout page of the website. (Id. ¶ 92.) After Meta viewed and analyzed Plaintiffs' private communications with Walgreens, Plaintiffs began receiving targeted ads on their Facebook accounts related to the medical conditions and treatments they disclosed to Defendant. (Id. ¶ 104.) And even non-Facebook users can be individually identified via the information gathered on the website, like an IP address or personal device identifying information. (Id. ¶ 99.)

In sum, Walgreens employed devices like the Meta Pixel, Google Tag Manager, and similar technologies to intercept, duplicate, and re-direct Plaintiffs' and class members' "Private Information"—that is, their personally identifiable information ("PII") and protected health information ("PHI")—to third parties like Facebook, Google, Bing, and Pinterest. (Id. ¶ 73.) When Plaintiffs or other class members used Defendant's Website to purchase sensitive healthcare products to diagnose and/or treat highly sensitive and private conditions, their identities, personal identifiers, and health information (including their medical conditions and treatments sought) were disclosed to Meta without their consent. (Id. ¶¶ 21, 93.) Based on information and belief, Walgreens also improperly disclosed Plaintiffs' and class members' computer IP addresses to third parties like Facebook, Google, Bing and Pinterest through its use of the Pixels in addition to names, phone numbers, email addresses, dates of birth, Walgreens client ID numbers, services selected, assessment responses, patient statuses, medical conditions, treatments, and provider information. (Id. ¶ 108.)

Yet Walgreens's privacy policies represent that it will keep Private Information private and secure and that it will only disclose Private Information under certain circumstances—none of which is true. (Id. ¶ 95.) These privacy policies state that Plaintiffs' and class members' protected health information will not be shared for marketing purposes without prior, written permission. (Id. ¶ 96.) Plaintiffs and class members have not provided Walgreens with such written permission. (Id. ¶ 97.) Nor do Defendant's privacy policies specifically disclose that viewing or purchasing sensitive healthcare products will be sent to social media companies for any purpose. (Id. ¶ 98.) Plaintiffs and class members had no idea that their Private Information was being collected and transmitted to an unauthorized third party. (Id. ¶ 178.)

Plaintiff R.C. is a citizen of California residing in Palm Desert, California; she used Defendant's website to purchase sensitive healthcare products within the past year. (Id. ¶ 40.) On at least one occasion, Plaintiff R.C. specifically sought to purchase Monistat to treat a vaginal yeast infection and placed Monistat in her virtual shopping cart on the website. (Id. ¶ 183.) By interacting with Defendant's website, Plaintiff R.C.'s Private Information was disclosed to Meta through Walgreens's placement of the Meta Pixel on the webpages she visited, including, but not

limited to, the webpages for the search engine and the specific Monistat product that she placed in her virtual shopping cart on the Website, as well as the virtual shopping cart page. (Id. ¶ 184.) That information included, but was not limited to, her intent to purchase Monistat when she placed Monistat into her virtual shopping cart. (Id.) R.C. had an active Facebook account at the time of her interaction with Defendant's website. (Id. ¶ 186.) She would not have used the website to purchase sensitive healthcare products including Monistat had she known that her Private Information would be disclosed to unauthorized third parties. (Id. ¶ 187.) She believed that because she was on the website of a healthcare provider and pharmacy, her Private Information would be protected and kept confidential. (Id. ¶ 188.) R.C. saw nothing on the website that suggested to her that her Private Information would be disclosed or released to an unauthorized third party and did not authorize, consent to, or otherwise engage or permit the release of her Private Information to Meta or any third party. (Id. ¶¶ 188–90.)

Plaintiff T.S. is a citizen of Virginia residing in Midlothian, Virginia; she used Defendant's website to purchase sensitive healthcare products, including a test kit for diabetes, within the past year. (Id. ¶¶ 41, 191–92.) By interacting with Defendant's website, Plaintiff T.S.'s Private Information was disclosed to Meta through Walgreens's placement of the Meta Pixel on the webpages she visited on Defendant's website, including, but not limited to, the webpages for the search engine and the specific diabetes test kit product that she placed in her virtual shopping cart on the website, as well as the virtual shopping cart page. (Id. ¶ 193.) That information included, but was not limited to, her intent to purchase a diabetes test kit when she placed the diabetes test kit into her virtual shopping cart on the website and the inference that she or a family member had diabetes. (Id.) T.S. had an active Facebook account at the time of her interaction with Defendant's website, and shortly after visiting the website to purchase the diabetes testing kit, she started to receive unsolicited advertisements on Facebook relating to her purchase of the diabetes testing kit. (Id. ¶ 195.) She would not have used the website to purchase sensitive healthcare products including the diabetes test kit had she known that her Private Information would be disclosed to unauthorized third parties. (Id. ¶ 196.) She believed that because she was on the website of a healthcare provider and pharmacy, her Private Information would be protected and kept confidential. (Id. ¶ 197.) T.S. saw nothing on the website that suggested to her that her Private Information would be disclosed or released to an unauthorized third party and did not authorize, consent to, or otherwise engage or permit the release of her Private Information to Meta or any third party. (Id. ¶¶ 198–90.)

### III. LEGAL STANDARD

#### A. Rule 12(b)(6)

Under Rule 12(b)(6), a party may bring a motion to dismiss for failure to state a claim upon which relief can be granted. Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires a "short and plain statement of the claim showing that a pleader is entitled to relief," in order to give the defendant "fair notice of what the claim is and the grounds upon which it rests." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007); see Ileto v. Glock Inc., 349 F.3d 1191, 1199-1200 (9th Cir. 2003). When evaluating a Rule 12(b)(6) motion, a court

must accept all material allegations in the complaint—as well as any reasonable inferences to be drawn from them—as true and construe them in the light most favorable to the non-moving party.  See Doe v. United States, 419 F.3d 1058, 1062 (9th Cir. 2005); ARC Ecology v. U.S. Dep't of Air Force, 411 F.3d 1092, 1096 (9th Cir. 2005); Moyo v. Gomez, 32 F.3d 1382, 1384 (9th Cir. 1994).  Courts are not required, however, "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  In re Gilead Scis. Sec. Litig., 536 F.2d 1049, 1055 (9th Cir. 2008) (internal citation and quotation omitted).  Courts also need not accept as true allegations that contradict facts which may be judicially noticed.  See Mullis v. U.S. Bankr. Court, 828 F.2d 1385, 1388 (9th Cir. 1987).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Twombly, 550 U.S. at 555 (citations omitted).  Rather, the allegations in the complaint "must be enough to raise a right to relief above the speculative level."  Id.

To survive a motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  Id. at 570; Ashcroft v. Iqbal, 556 U.S. 662 (2009).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'"  Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 556).  The Ninth Circuit has clarified that (1) a complaint must "contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively," and (2) "the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation."  Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011).

## B.     Rule 15

Rule 15 provides that leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a).  The Ninth Circuit has held that "'[t]his policy is to be applied with extreme liberality.'"  Eminence Cap., L.L.C. v. Aspeon, Inc., 316 F.3d 1048, 1051 (9th Cir. 2003) (quoting Owens v. Kaiser Found. Health Plan, Inc., 244 F.3d 708, 712 (9th Cir. 2001)). Generally, a "district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by allegation of other facts."  Lopez v. Smith, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (citation omitted).

## IV.   DISCUSSION

Defendant moves to dismiss all nine of Plaintiffs' claims for failure to state a claim under Rule 12(b)(6).  (See Motion at 2.)  The Court analyzes Defendant's arguments in turn.

//

### A.       Claim One: Invasion of Privacy

To state a claim for invasion of privacy, "Plaintiffs must show that (1) they possess a legally protected privacy interest, (2) they maintain a reasonable expectation of privacy, and (3) the intrusion is so serious . . . as to constitute an egregious breach of the social norms such that the breach is highly offensive." In re Facebook, Inc. Internet Tracking Litigation, 956 F.3d 589, 601 (internal quotations omitted). "Determining whether a defendant's actions were highly offensive to a reasonable person requires a holistic consideration of factors such as the likelihood of serious harm to the victim, the degree and setting of the intrusion, the intruder's motives and objectives, and whether countervailing interests or social norms render the intrusion inoffensive." Id. at 606. The analysis must also focus on the degree to which the invasion is "unacceptable as a matter of public policy." Id.

Defendant argues that Plaintiffs failed to plead "any facts showing that they submitted any personal health data to Walgreens or that any highly offensive disclosure occurred even if Plaintiffs purchased healthcare products," and instead "merely assume that a third party could infer or deduce 'protected health information' specific to them based on their shopping history, specifically their viewing and purchasing history on the [w]ebsite." (Motion at 10.) The first component of Defendant's argument is that Plaintiffs fail to allege they submitted any personal health information on the website that was identifiable as their information, and as such, Plaintiffs fail to allege they had any legally protected privacy interest. Central to this argument are Defendant's contentions that (1) IP addresses are not assigned to specific people, but instead assigned to specific devices, and (2) there is no legally protected privacy interest in IP addresses. (Id. at 8, 9.)

Plaintiffs respond that Defendant misconstrues the personal health data Plaintiffs allege was disclosed. (See Opposition at 6 n.6.) Plaintiffs do not allege that their harms flow from the disclosure of their IP addresses alone; they do not argue that the relevant privacy interest emanates from their IP addresses. Instead, Plaintiffs allege that their IP address information, when *paired with* the private health information conveyed by their browsing and shopping activities, creates a legally protected privacy interest. (See id.) Defendant's arguments concerning IP addresses are largely irrelevant, as their private health information was rendered personally identifiable due to the Meta Pixel's operation with Facebook cookies, which, working together, caused Plaintiffs' product selections to be transmitted via the Meta Pixel alongside their unique Facebook ID. (Id. at 6.) When Plaintiffs' browsing and shopping activities were connected to their Facebook IDs, that information became personally identifiable.

The Court agrees in part with both positions. Insofar as Defendants assert that Plaintiffs do not have a legally protected privacy interest in their IP addresses, the Court agrees. Heeger v. Facebook, Inc., 509 F. Supp. 3d 1182, 1189 (N.D. Cal. 2020) ("Plaintiffs do not plausibly allege anything more than the collection of IP addresses, and there is no legally protected privacy interest in IP addresses.") As Heeger explained, "every computer or server connected to the Internet has a unique IP address, and [a]n IP address is a numerical identifier for each computer

or network connected to the Internet." Id. (internal citations and quotations omitted).  As such, "Internet users have no expectation of privacy in . . . IP addresses of the websites they visit because they should know that this information is provided to and used by Internet service providers for the specific purpose of directing the routing of information." Id. (internal quotations and citations omitted).  Thus, to the extent Plaintiffs premise any of their privacy claims on the transmission of their IP addresses alone, those claims fail.

However, Plaintiffs allege another means though which information about their health-related purchases was rendered personally identifiable: association with their unique Facebook IDs.  (See Opposition at 6–7.)  They allege that both R.C. and T.S. had active Facebook accounts during the relevant period, and the Meta Pixel operated in conjunction with Facebook cookies to identify Plaintiffs' unique Facebook user IDs so that Plaintiffs' product selections were transmitted via the Meta Pixel alongside that unique ID.  (See SAC ¶¶ 88–94, 182–95.)  "A Facebook user—even one using a nickname—generally is an identified person on a social network platform.  The Facebook User ID is more than a unique, anonymous identifier.  It personally identifies a Facebook user." In re Hulu Priv. Litig., 2014 WL 1724344, at *14 (N.D. Cal. Apr. 28, 2014).  The Court therefore concludes that Plaintiffs have adequately alleged that the information at issue was personally identifiable.

Defendant presents an alternative argument against the sufficiency of Plaintiffs' privacy claims: Plaintiffs fail to connect their conclusory allegations concerning how the tools identified in their SAC *could* operate to disclose personal health information to any actual disclosure of *their own* personal health information.  According to Defendant, Plaintiffs "plead in conclusory terms that, 'on information and good faith belief,' the entire shopping 'process' on the [w]ebsite is tracked . . . [a]nd although they try to plead around this issue in their SAC by alleging in conclusory terms that the pages they visited allegedly had tracking tools, Plaintiffs still do not allege any specific facts showing that the 'custom events' they allege they took on the [w]ebsite were disclosed to a third party."  (Motion at 9 (internal citations removed).)  Defendant urges the Court that "in an invasion of privacy case, it is not enough to plead an 'overarching theory' that the defendant collected and disclosed 'personal and sensitive medical information' where plaintiffs 'fail to factually explain their personal participation' in the alleged activity."  (Motion at 6 (quoting Cousin v. Sharp Healthcare, 2023 WL 4484441, at *3–4 (S.D. Cal. July 12, 2023) ("Cousin I").)  According to Defendant, Plaintiffs have not adequately alleged an intrusion of any kind because their allegations are too general, and their privacy claims fail on that basis.

Defendant relies heavily upon Cousin I for the above contention.  In Cousin I, the court dismissed invasion of privacy claims because the plaintiffs' "overarching theory of their case, underlying all claims, is that Defendant collected patients' personal and sensitive medical information on [Defendant's] website and that this information was then improperly shared with Meta without patients' consent," but they "fail to factually explain their personal participation in any of this." Id. at *3.  For example, the Cousin I plaintiffs did not provide "any meaningful factual support as to what activities each [p]laintiff engaged in on [Defendant's] website and what information each [p]laintiff provided," nor that "these activities took place on a page of [Defendant's] website where Meta Pixel was embedded." Id.  In sum, the plaintiffs in Cousin I

---

**CIVIL MINUTES—GENERAL**

described how Defendant's website collected and transmitted information as a general matter but failed to allege facts demonstrating how plaintiffs themselves interacted with that website. <u>See id.</u> (finding inadequate that plaintiffs "summarily contend that they made, booked, or scheduled appointments through [defendant's] website" but do not allege that they used the specific buttons and links which allegedly shared information with third parties).

The Court agrees with the holding of <u>Cousin I</u> but finds it easily distinguishable. Plaintiffs allege that (1) they each visited Defendant Walgreens's website and placed specific items in their online shopping carts (for R.C., Monistat, a treatment for yeast infections, and for T.S., a diabetes test kit), <u>see</u> SAC ¶¶ 182–83, 192–93; (2) Walgreens's website used tracking tools, including the Meta Pixel and Facebook cookies, including at the time Plaintiffs used the website and placed those items in their shopping carts, <u>see id.</u> ¶¶ 57–87; (3) together, the Meta Pixel and Facebook cookies collect information about the items placed in users' shopping carts and connect that information to the users' unique Facebook User IDs, <u>see id.</u>; (4) these tracking tools existed on the specific webpages Plaintiffs interacted with, including the shopping cart page, <u>see id.</u> ¶¶ 184, 193; and (5) because of the foregoing, Plaintiffs' personal information was disclosed to Meta, without Plaintiffs' knowledge, authorization, or consent, <u>see id.</u> ¶¶ 184–90, 193–99. Unlike the plaintiffs in <u>Cousin I</u>, Plaintiffs here provide sufficient factual detail about the actions they took on Defendant's website and adequately alleged that such actions would have resulted in the transmission of their information to Meta without their consent. This conclusion does not end the inquiry, as Defendant also argues that Plaintiffs failed to plead that the information disclosed was personal health data and that any highly offensive disclosure occurred. (<u>See</u> Motion at 10.) The Court considers those arguments below, but concludes at this juncture that Plaintiffs adequately connect their overarching theory of how Defendant's website collected and transmitted users' information to Plaintiffs' specific interactions with that website.[3] The SAC is not deficient in this regard.

Defendant next argues that Plaintiffs failed to "plead any facts showing that they submitted any personal health data to Walgreens or that any highly offensive disclosure occurred even if Plaintiffs purchased healthcare products." (Motion at 10.) According to Defendant, Plaintiffs allege only "public website browsing" and do not allege "that they were signed into any type of private portal or otherwise had any expectation that they were sharing sensitive medical information—under their flawed theory, any company can be sued for purportedly disclosing data regarding someone's purchases even when no actual personal health information or condition or treatment information is disclosed and the buyer is not necessarily the end-user." (<u>Id.</u> at 10–11.)

---

[3] Defendant also takes issue with Plaintiffs' allegations relying on "information and belief," arguing that all such allegations "fail because Plaintiffs do not plead any facts supporting the allegations or showing the basis for belief." (Motion at 9.) Not so. Pleading upon information and belief is appropriate where, as here, "the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible." <u>Soo Park v. Thompson</u>, 851 F.3d 910, 928 (9th Cir. 2017) (quotation marks omitted).

The Court disagrees with Defendant's attempt to paint a bright line barring privacy claims based on website browsing activity, and finds the cases it cites distinguishable. In Cousin I, the court concluded that the disclosure of "names, emails, phone numbers, addresses, social security numbers, browsing histories, and user locations" to Meta via defendant's public website—disclosures made "during routine browsing activity"—did not rise to the level of "highly offensive." Cousin I, 2023 WL 4484441, at *6. However, Cousin I also concluded that plaintiffs had sufficiently plead "that an alleged disclosure of sensitive health information on [defendant's] appointment scheduling page is 'highly offensive.'" Id. In Heeger, the court dismissed privacy claims upon finding that there was no reasonable expectation of privacy in generalized location data collected by Facebook because such information was not "sensitive or confidential." Heeger, 509 F. Supp. 3d at 1193. Contrary to Defendant's construction, the Heeger court did not dismiss the privacy claims because it had "doubts about the seriousness of the alleged invasion." (See Motion at 11.) Though the court expressed such doubts in passing, it explicitly declined to decide the issue, and its ruling was not tethered to (nor did it contain) any analysis concerning the seriousness of the alleged invasion. See Heeger, 509 F. Supp. 3d at 1193–94 ("[P]laintiffs have not plausibly alleged a reasonable expectation of privacy in the location data collected by Facebook. The Court has doubts about the seriousness of the alleged invasion as well, but does not need to decide that now."). In Defendant's third cited case, Low v. LinkedIn Corp., 900 F. Supp. 2d 1010, 1025 (N.D. Cal. 2012), plaintiffs alleged their browsing histories—specifically, which LinkedIn profiles they viewed—were improperly disclosed without their consent. The court concluded that such disclosure did not amount to a "serious invasion of the protected privacy interest." Id.

Of these three cases, only Cousin I involved health information: Heeger concerns location data and Low concerns LinkedIn profiles. Analyses regarding the highly offensive nature of intercepting location data and LinkedIn profiles are not directly applicable to intrusions concerning personal health information. See In re Ambry Genetics Data Breach Litig., 567 F. Supp. 3d 1130, 1143 (C.D. Cal. 2021) (as a general matter, the disclosure of medical information "is more likely to constitute an egregious breach of the social norms that is highly offensive") (internal quotations removed). The Court is thus unpersuaded that "California courts have rejected this type of claim" merely because the alleged invasion occurred as a result of Plaintiffs' activities on a public website. (See Motion at 11.). The case law does not support that bright line rule. See, e.g., Cousin v. Sharp Healthcare, 2023 WL 8007350, at *3 (S.D. Cal. Nov. 17, 2023) ("Cousin II") (finding that plaintiffs' "interactions on Defendant's website, while 'unauthenticated' or publicly facing, plausibly involve" protected health information sufficient to plead invasion of privacy claims); In re Meta Healthcare Pixel Litig., 2024 WL 333883, at *3 (N.D. Cal. Jan. 29, 2024) ("Plaintiffs' privacy claims are not foreclosed at this juncture in whole or part simply because their communications with their healthcare providers may have been through publicly available webpages.").

Defendant makes a somewhat stronger argument concerning the strength of the inference to be drawn from Plaintiffs' browsing activity. According to Defendant, "[c]ourts have consistently rejected allegations that allege privacy violations because a third party supposedly

could infer or surmise a plaintiff's health condition based on that plaintiff's browsing activity on a public website." (Motion at 8.) In Smith v. Facebook, Inc., for example, the court distinguished between "general health information that is accessible to the public at large" and "information [that] relates specifically to [p]laintiffs' health." 262 F. Supp. 3d 943, 954–55 (N.D. Cal. 2017), aff'd, 745 F. App'x 8 (9th Cir. 2018). The Smith court found that the information at issue—including URLs for webpages concerning "treatment options for melanoma, information about a specific doctor, search results related to the phrase 'intestine transplant,' [and] a wife's blog post about her husband's cancer diagnosis"—"contain general health information that is accessible to the public at large" and "[n]othing about the URLs, or the content of the pages located at those URLs, relates to the past, present, or future physical or mental health or condition of an individual." Id. (internal footnotes and quotations omitted). The Smith court thus concluded that plaintiffs could not state a claim for violations of the Health Insurance Portability and Accountability Act ("HIPAA"), 42 U.S.C. §§ 1320d–1320d–8, nor under a similar California state law, Cal. Civ. Code § 1798.91. Id. That court did not, however, apply the same analysis to plaintiffs' invasion of privacy claim, and dismissed those claims on separate grounds (consent). Id.

Though this Court agrees with the distinction drawn by Smith, its analysis does not shed much light on Plaintiffs' invasion of privacy claims. First, Plaintiffs here allege attempts to purchase specific health-related items which give rise to an obvious inference about the purchaser's health condition. An internet user might research medical information for reasons unrelated to the user's own health conditions. But an internet user is very unlikely to purchase a diabetes test kit or a yeast infection treatment for reasons unrelated to the user's own health conditions. Unlike in Smith, the information at issue here "relates specifically to Plaintiffs' health." Smith, 262 F. Supp. 3d 954–55. And, as the Court notes above, the relevant portions of Smith do not concern claims for invasion of privacy.

Defendant also urges the Court to follow Cousin I, which concluded that invasion of privacy claims do not lie where a third party could surmise a plaintiff's health condition based on the plaintiff's browsing activity on a public website. (Motion at 8.) As referenced above, Cousin I dismissed plaintiffs' invasion of privacy claims for failure to adequately allege how plaintiffs themselves interacted with the defendant's website. Cousin I, 2023 WL 4484441, at *3. The court went on explain that even if plaintiffs had "provided this missing information," their claims would still fail, because they merely used a public website to "research . . . doctors," "look for providers," and "search for medical specialists"—all of which is "general information that is accessible to the public at large" and does not "relate[] specifically to" plaintiffs' health. Id. (citing Smith, 262 F. Supp. 3d 954–55). Cousin I is thus distinguishable for the same reasons as Smith: Plaintiffs here allege more than merely viewing generic medical content on a publicly facing website; they allege that they purchased specific products to treat specific health conditions. Moreover, in Cousin II, the court found that plaintiffs had adequately alleged their invasion of privacy claims because the URLs at issue revealed "treatments for medical conditions—and therefore plausibly conveyed content: their PHI." Cousin II, 2023 WL 8007350, at *5.

---

Although the cases discussed above preclude claims for public browsing activities that do not reveal personal medical information, the Court is persuaded that Plaintiffs' allegations differ in kind and severity. The SAC explains how Defendant's disclosure of their private information to Meta via the Pixel included the purchasing of sensitive healthcare products (Monistat and a diabetes test kit) related to specific health conditions (yeast infection and diabetes). (See SAC ¶¶ 88–94, 183–84, 192–93.) The Court finds those facts sufficient to survive a motion to dismiss based on the "highly offensive" element. To be sure, Plaintiffs could have placed items in their online shopping carts which do not implicate any personal medical information. Had Plaintiffs alleged only that they purchased, say, beauty products and laundry detergent, it is unlikely that a privacy claim would flow from such activity. Similarly, the question would be much closer had Plaintiffs purchased health-related items less indicative of a medical condition—for example, daily vitamins, thermometers, or toothpaste. But the personal nature of the medical products Plaintiffs allegedly purchased, and the obvious inferences to be drawn from those purchases, render any disclosure of that information much more likely to seriously harm the purchaser and violate social norms. Accepting Plaintiffs' allegations as true and construing them in the light most favorable to Plaintiffs, the Court concludes that Plaintiffs have adequately pleaded their invasion of privacy claims. See Doe v. United States, 419 F.3d at 1062.

Defendant's final argument attacking the sufficiency of Plaintiffs' invasion of privacy allegations is that Walgreens's Online Privacy and Security Policy (the "Privacy Policy") provides specific disclosures of how Plaintiffs' information may be used by third parties, and these disclosures demonstrate Plaintiffs' consent. (Motion at 11–12.) The Privacy Policy states that Walgreens may "work with other companies who place cookies, tags, and web beacons on our websites" to "help operate our website and provide you with additional products and services." (RJN, Ex. A at 7.) The Privacy Policy further states that "[b]y interacting with Walgreens through [the Website], you consent to the practices described in this Privacy Policy." (Id. at 9.) It also explains that Defendant collects information about in-store or online purchases and contains information regarding how to opt-out of the disclosure of this information. (Id. at 7–8, 12, 16.) The Privacy Policy includes state-specific disclosures of how information is used by third parties for certain states, like Virginia and California (Plaintiffs' states of residence). (Id. at 11–16.) According to Defendant, these disclosures demonstrate Plaintiffs' consent, and since Plaintiffs consented, they had no reasonable expectation of privacy. (Motion at 11.)

Plaintiffs respond that (1) "Walgreens does not disclose that it divulges Plaintiffs' [private health information] to Facebook so that Facebook can then use that information to specifically identify Walgreens' customers and send advertisements to them about their protected medical conditions," and (2) even if the disclosures were adequate, Defendant does not explain how Plaintiffs were presented with the policy or manifest their assent. (Opposition at 2–5, 9.) The question is thus "whether the [Privacy Policy] sufficiently establishes user consent by putting users on notice of [Defendant's] alleged conduct, and if so, to what extent." See In re Yahoo Mail Litig., 7 F. Supp. 3d 1016, 1029 (N.D. Cal. 2014). As a general matter, when "voluntary consent is present, a defendant's conduct will rarely be deemed highly offensive to a reasonable person so as to justify tort liability." Hill v. Nat'l Collegiate Athletic Assn., 7 Cal. 4th 1, 3 (1994).

In the main case on which Defendant relies, <u>In re Yahoo Mail Litig.</u>, the parties did not dispute that users agreed to the terms at issue. 7 F. Supp. 3d 1016 (N.D. Cal. 2014). There, plaintiffs were required to click a "Create Account" button which appeared below the following sentence: "I agree to the Yahoo Terms and Privacy"—words which themselves linked to the policies they referenced. <u>Id.</u> at 1028. By contrast, Defendant Walgreens's website does not require users to affirmatively assent to Defendant's Privacy Policy. To review the Privacy Policy, users must scroll down to the bottom of the website's homepage and click on a link; they do not need to affirmatively assent to the Policy. (<u>See</u> Reply at 5 ("[T]he Privacy Policy is conspicuously disclosed at the bottom of the homepage.").) The Privacy Policy thus "falls into the browsewrap agreement category." <u>Byars v. Goodyear Tire & Rubber Co.</u>, 654 F. Supp. 3d 1020, 1025 (C.D. Cal. 2023) (finding terms of use available to website user if the user clicked a link in a pop-up banner to be a browsewrap agreement because there was no means for users to accept the terms and the hyperlink could otherwise be found at the bottom of the website); <u>accord</u> <u>Nguyen v. Barnes & Noble Inc.</u>, 763 F.3d 1171, 1176 (9th Cir. 2014) ("Unlike a clickwrap agreement, a browsewrap agreement does not require the user to manifest assent to the terms and conditions expressly ... [a] party instead gives his assent simply by using the website.") Because the Privacy Policy is a browsewrap agreement, "it can only be enforceable against [Plaintiffs] if [they] had actual or constructive knowledge of" the Policy. <u>Byars</u>, 654 F. Supp. 3d at 1026.

Here, Plaintiffs plead that they "saw nothing on the Website that suggested to [them] that [their] Private Information would be disclosed or released to an unauthorized third party." (SAC ¶¶ 189, 198.) Taking that allegation as true, the Court cannot conclude that Plaintiffs consented to the disclosure they allege.[4]

In sum, although "there is no reasonable expectation of privacy when the data collection is within users' common-sense expectation or when the information is not sensitive," <u>Hammerling v. Google LLC</u>, 615 F. Supp. 3d 1069, 1089 (N.D. Cal. 2022), the Court cannot conclude at the motion to dismiss stage that either of these conditions is met. Evidence gathered by the parties during the litigation may ultimately demonstrate that Plaintiffs did not have a reasonable expectation of privacy. But Plaintiffs have done enough to survive a motion to dismiss because they plead allegations which, taken as true and construed in the light most favorable to Plaintiffs, state a plausible claim for invasion of privacy. Accordingly, Defendant's Motion is **DENIED** as to Plaintiff's first cause of action.

//
//
//

---

[4] Because the Court finds that Plaintiffs did not have actual or constructive notice of the Privacy Policy and dispenses with Defendant's argument on that basis, it declines to decide at this stage whether the substantive terms described in the Policy would have put Plaintiffs on notice of the specific disclosures they allege.

### B.   Claim Two: Negligence

"Under California law, '[t]he elements of negligence are: (1) defendant's obligation to conform to a certain standard of conduct for the protection of others against unreasonable risks (duty); (2) failure to conform to that standard (breach of the duty); (3) a reasonably close connection between the defendants conduct and resulting injuries (proximate cause); and (4) actual loss (damages)." <u>Corales v. Bennett</u>, 567 F.3d 554, 572 (9th Cir. 2009) (quoting <u>McGarry v. Sax</u>, 158 Cal. App. 4th 983, 994 (2008)).  Defendant moves to dismiss Plaintiffs' negligence claims, arguing that Plaintiffs failed to "allege any requisite duty owed by Walgreens," or allege "that they suffered any nonspeculative injury as a result of a breach of such duty."  (Motion at 12.)

### 1. Duty

Plaintiffs contend that the SAC alleges four duties owed by Walgreens: (1) a common law duty to prevent foreseeable harm to others, (2) an unspecified special relationship between Walgreens and Plaintiffs, (3) regulatory duties under HIPAA to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of [PHI]," and (4) a duty as the recipient of Plaintiffs' health information.  (Opposition at 10–11 (citing SAC ¶¶ 237–52).)  At the outset, Defendant is correct that the SAC does not allege a common law duty to prevent foreseeable harm to others.  (<u>See</u> SAC ¶¶ 237–52.)  The Court will only consider the parties' arguments concerning the duties actually referenced in the SAC.

### a. Special Relationship

As a general matter, "[a] special relationship between the defendant and the victim is one that gives the victim a right to expect protection from the defendant."  <u>Brown v. USA Taekwondo</u>, 11 Cal. 5th 204, 216 (2021).  Common examples of special relationships are those "between parents and children, colleges and students, employers and employees, common carriers and passengers, and innkeepers and guests."  <u>Id.</u>  Although Plaintiffs assert in their Opposition that they have alleged a duty stemming from the special relationship between Walgreens and Plaintiffs, they do not identify in their Opposition or in their SAC the source for this alleged special relationship.  The SAC states as follows: "Defendant's duty of care to use reasonable measures to secure and safeguard Plaintiffs' and Class members' Private Information arose *due to the special relationship* that existed between Defendant and its customers, which is recognized by statute, regulations, and the common law."  (SAC ¶ 242 (emphasis added).)  It appears that Plaintiffs do not believe this special relationship is created by HIPAA, as the SAC alleges that Defendant owes a specific, additional duty by virtue of HIPAA regulations: "*In addition*, Defendant had a duty under HIPAA privacy laws . . ."  (<u>Id.</u> ¶ 243 (emphasis added).)  Plaintiffs do not identify any other statute or case which suggests that there is a special relationship between Plaintiffs and an entity like Defendant.  As such, Plaintiffs have not adequately alleged a special relationship sufficient to support their negligence claims.

---

### b. Regulatory Duty Under HIPAA

The SAC contains specific allegations concerning the duty of care owed by Defendant in accordance with HIPAA: "Defendant Walgreens' duty to use reasonable security measures under HIPAA required Defendant Walgreens to 'reasonably protect' confidential data from 'any intentional or unintentional use or disclosure' and to 'have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information.'" (SAC ¶ 244 (quoting 45 C.F.R. § 164.530(c)(1)). Defendant argues that "'an alleged HIPAA violation cannot form the basis of a negligence claim' because HIPAA has no private right of action." (Motion at 12 (quoting Austin v. Atlina, 2021 WL 6200679, at *3 (N.D. Cal. Dec. 22, 2021)). There is no private right of action under HIPAA, and two courts in the Northern District of California have therefore concluded that HIPAA cannot be a basis for a negligence per se claim. See Austin v. Atlina, 2021 WL 6200679, at *3; Doe v. Meta Platforms, Inc., 2023 WL 5837443, at *13 (N.D. Cal. Sept. 7, 2023). But at least one court in this District found otherwise:

> Defendants argue that Plaintiffs' reliance on the doctrine of negligence per se fails because the FTC Act and HIPAA do not provide a private right of action. But Plaintiffs are not attempting to sue under these statutes. Rather, the statutes "instead serve[ ] the subsidiary function of providing evidence of an element of a pre-existing common law cause of action." Crusader Ins. Co. v. Scottsdale Ins. Co., 54 Cal. App. 4th 121, 125 (1997); see Bureerong v. Uvawas, 959 F. Supp. 1231, 1237 (C.D. Cal. 1997) ("The Court disagrees with Hub's broad and general contention that the Court may not recognize a negligence per se claim simply because the statute upon which the claim is based confers no private right of action.") In other words, "it is the tort of negligence, and not the violation of the statute itself, which entitles a plaintiff to recover civil damages ... [T]he plaintiff is not attempting to pursue a private cause of action for violation of the statute; rather, he is pursuing a negligence action and is relying upon the violation of a statute, ordinance, or regulation to establish part of that cause of action." Sierra–Bay Fed. Land Bank Ass'n. v. Superior Court, 227 Cal. App. 3d 318, 333 (1991). Accordingly, Plaintiffs' reliance on the negligence per se doctrine does not fail merely because the statutes they allege Defendants violated do not provide a private right of action.

In re Ambry, 567 F. Supp. 3d at 1142–43 (some internal citations omitted). The Court finds In re Ambry's reasoning persuasive and follows the published precedent of this District in concluding that a duty may arise from HIPAA and serve as the basis for a negligence claim under California law. Plaintiffs have thus adequately plead the duty element of their negligence claim against Defendant.

### c. Duty as Recipient of Health Information

For the sake of judicial economy, the Court will address Plaintiffs' additional duty theories. According to Plaintiffs, they have also alleged a general duty between Defendant and

Plaintiffs because "as one of the largest pharmacy chains in the United States, Walgreens owed Plaintiffs a duty of care to safeguard the PII/PHI Plaintiffs entrusted to Walgreens." (Opposition at 11.) However, the cases Plaintiffs cite in support of this contention are data breach cases, not general negligence cases, and they do not establish the duty Plaintiffs allege. See Stasi v. Inmediata Health Grp. Corp., 501 F. Supp. 3d 898, 905 (S.D. Cal. 2020); Bass v. Facebook, Inc., 394 F. Supp. 3d 1024, 1039 (N.D. Cal. 2019). The analyses performed by the Stasi and Bass courts were specific to the harm there alleged and the injury suffered—broad data breaches which resulted in the plaintiffs' information being revealed to the public. See Stasi, 501 F. Supp. 3d at 905; Bass, 394 F. Supp. 3d at 1039. Contrary to Plaintiffs' construction, those cases did not impose a general duty on part of entities which collect online users' information (medical or otherwise) with respect to how such information is sold or otherwise intentionally shared with third parties. See id. Instead, they concerned such entities' responsibilities with respect to *data security measures*. See id. The Court therefore concludes that Plaintiffs cannot allege a duty on this basis.

### 2. Injury

Defendant also argues that Plaintiffs have not adequately alleged an injury sufficient to support their negligence claims. (Motion at 13–14.) Under California law, "negligence claims must result in actual damages from the complained-of conduct." Sallie Holly v. Alta Newport Hosp., Inc., 2020 WL 6161457, at *3 (C.D. Cal. Oct. 21, 2020). Accordingly, to state a negligence claim, Plaintiffs must allege an "appreciable, nonspeculative, present injury." Low, 900 F. Supp. 2d at 1032 (citing Aas v. Super. Ct., 24 Cal. 4th 627, 646 (2000), superseded by statute on other grounds as stated in Rosen v. State Farm Gen. Ins. Co., 30 Cal. 4th 1070, 1079–80 (2003)).

Here, Plaintiffs allege that they were injured when their private information was divulged and potentially misused (including for marketing without their consent), which subjected them to unsolicited targeted advertisements related to the medical conditions they disclosed to Walgreens. (See SAC ¶ 249 (alleging "loss of the benefit of the bargain, increased infiltrations into their privacy through spam and targeted advertising they did not ask for, loss of privacy, loss of confidentiality, embarrassment, emotional distress, humiliation and loss of enjoyment of life"). Plaintiffs also allege "ascertainable losses of money or property, and monetary and nonmonetary damages, as described herein, including but not limited to: loss of value of their Private Information; overpayment for Defendant's services; and loss of the value of access to their Private Information." (Id. ¶ 386.) The Court finds these allegations too vague and conclusory to survive.

First, although emotional distress damages can be sufficient to sustain a negligence claim, Plaintiffs' emotional distress allegations are too conclusory. See Sallie Holly, 2020 WL 6161457, at *3 (allegations that a plaintiff "experienced fear of identity theft, embarrassment, generalized anxiety ... emotional pain and upset" were "too sparse and conclusory to support" her claims for damages"); Sion v. SunRun, Inc., 2017 WL 952953, at *2 (N.D. Cal. Mar. 13, 2017) ("Although actual damages can include emotional distress, a plaintiff must support her claim for pain and

suffering with something more than her own conclusory allegations, such as specific claims of genuine injury.") (internal citations, quotations, and alterations omitted). Plaintiffs must do more than state they experienced emotional distress; they must allege "facts pertaining to the nature and extent of [p]laintiffs' emotional or mental suffering." Burnell v. Marin Humane Soc'y, 2015 WL 6746818, at *19 (N.D. Cal. Nov. 5, 2015).

The same is true with respect to Plaintiffs' conclusory allegations concerning the lost economic value of their information, which are unsupported by any facts explaining what economic value the information held *to Plaintiffs* and how it was lost through Defendant's dissemination. See Low, 900 F. Supp. 2d at 1032 ("[T]he Amended Complaint fails to allege how either Plaintiff was foreclosed from capitalizing on the value of his personal data."). Courts in this circuit have dismissed cases where, like here, the injury is based on "the loss of the inherent value of their personal data." Doe v. Meta Platforms, Inc., 2023 WL 5837443, at *15 (N.D. Cal. Sept. 7, 2023) (citing Cottle v. Plaid Inc., 536 F. Supp. 3d 461, 484 (N.D. Cal. 2021)). However, Plaintiffs are correct that at least one court in the Northern District found that by obtaining plaintiffs' data and selling it to advertisers, defendant had "diminished" plaintiffs' "future property interest" in the data sufficient. See Brown v. Google LLC, 2021 WL 6064009, at *17 (UCL claim). But in Brown, the data at issue was browsing histories for which the defendant (Google) had previously paid customers to obtain. See id. Here, the case concerns the receipt of personal health information which Plaintiffs consider too private to share with third parties. As such, it is unclear "how plaintiffs could and would participate in a legitimate market for health care information." Doe v. Meta Platforms, Inc., 2023 WL 5837443, at *15. Without specific facts alleging how Plaintiffs would so participate (as opposed to how the market for health data functions on a broader scale, see SAC ¶¶ 160–62), the Court cannot conclude that their information lost value. See Hart v. TWC Prod. & Tech. LLC, 526 F. Supp. 3d 592, 603 (N.D. Cal. 2021) ("That the information has external value, but no economic value to plaintiff, cannot serve to establish that plaintiff has personally lost money or property."); see also Low, 900 F. Supp. 2d at 1032. Although Plaintiffs generally allege that "several companies pay consumers for a license to track certain information," including browsing history, see SAC ¶ 163, they have not alleged that *they* would participate in such programs. Indeed, the SAC indicates that Plaintiffs have no interest in selling their browsing history, as it would reveal exactly the information they allege is too private to share with third parties. (See, e.g., SAC ¶¶ 264, 333, 350, 364, 379.)

Plaintiffs' allegations about the "continued and ongoing risk to their Private Information," see SAC ¶ 36, similarly fail because allegations about the mere risk of future damage are too speculative to satisfy the damages element of a negligence claim under California law. See In re Sony Gaming Networks & Customer Data Sec. Breach Litig., 903 F. Supp. 2d 942, 970 (S.D. Cal. 2012). In accordance with the above, Plaintiffs' negligence claim is **DISMISSED WITH LEAVE TO AMEND**.

//
//
//

### C. Claim Three: Unjust Enrichment

Defendant moves to dismiss Plaintiffs' claim for unjust enrichment, arguing that (1) unjust enrichment is not an independent cause of action, (2) Plaintiffs fail to allege that the equitable relief they seek through their unjust enrichment claim is more prompt, certain, or efficient than the damages they seek, and (3) Plaintiffs do not demonstrate that Walgreens has unjustly retained a benefit at their expense.  (Motion at 14–16.)

"Unjust enrichment is not a cause of action, however, or even a remedy, but rather a general principle, underlying various legal doctrines and remedies."  Rutherford Holdings, LLC v. Plaza Del Ray, 223 Cal. App. 4th 221, 231 (2014).  "The elements of a claim of quasi-contract or unjust enrichment are (1) defendant's receipt of a benefit and (2) unjust retention of that benefit at the plaintiff's expense."  MH Pillars Ltd. v. Realini, 277 F. Supp. 3d 1077, 1094 (N.D. Cal. 2017) (citing Peterson v. Cellco P'ship, 164 Cal. App. 4th 1583, 1593 (2008)).  "[I]n California, there is not a standalone cause of action for 'unjust enrichment,' which is synonymous with restitution."  Astiana v. Hain Celestial Group, Inc., 783 F.3d 753, 762 (9th Cir. 2015) (internal quotations and citations omitted).  However, "[w]hen a plaintiff alleges unjust enrichment, a court ***may construe the cause of action as a quasi-contract claim*** seeking restitution."  Id. (internal quotations and citations omitted) (emphasis added); accord Price v. Synapse Group, Inc., 2017 WL 3131700, at *10 (S.D. Cal. July 24, 2017).  Accordingly, the Court rejects Defendant's argument that Plaintiff's unjust enrichment claim must be dismissed merely because it is not a standalone claim under California law.

District courts within the Ninth Circuit are divided as to the propriety of pleading claims for equitable relief, including unjust enrichment, based on the same facts as other claims providing for a legal remedy of damages.  See Eason v. Roman Cath. Bishop of San Diego, 414 F. Supp. 3d 1276, 1282 (S.D. Cal. 2019) (discussing "intra-circuit split" on the issue with respect to UCL claims).  This Court is persuaded by the authorities that "allow plaintiffs to plead equitable relief in the alternative to legal relief and [do] not determine whether equitable relief is inadequate on a motion to dismiss," for "barring claims for equitable relief at the pleadings stage is inconsistent with the federal rules that permit pleading in the alternative."  Adams v. Cole Haan, LLC, 2021 WL 4907248, at *4 (C.D. Cal. Mar. 1, 2021) (citations omitted) (collecting cases); see Astiana, 783 F.3d at 765–66.  "[A]t the pleading stage all a plaintiff needs to allege is inadequate remedies at law to pursue equitable claims."  Brown v. Van's Int'l Foods, Inc., 2022 WL 1471454, at *13 (N.D. Cal. May 10, 2022). "Once the plaintiff has met her burden to plead the inadequacy of legal remedies, it will typically make sense to defer the determination of whether—on the particular facts of a particular case and in light of how the evidence develops—a plaintiff's legal remedies will ultimately be adequate."  Id.; accord C. M. v. MarinHealth Med. Grp., Inc., 2024 WL 217841, at *6 (N.D. Cal. Jan. 19, 2024) ("[W]here plaintiff has alleged insufficient remedies as a matter of law and where plaintiff is seeking restitution not allowed under the UCL, I will not dismiss an unjust enrichment claim at the pleading stage.")  Here, Plaintiffs seek non-restitutionary disgorgement, a type of relief not available under the UCL.

(See SAC ¶¶ 265, 268.)  As such, the Court will allow Plaintiffs to plead equitable relief under their unjust enrichment claim in addition to alternative legal relief.

Defendant also argues that Plaintiffs fail to plead the necessary elements of the claim. (Reply at 9.)  Defendant identifies two specific faults in the SAC: (1) the allegations do not demonstrate the existence of a quasi-contract and (2) the SAC does not include facts showing that Plaintiffs' personal data became less valuable.  (Id.)  As such, the SAC does not "present[] a viable quasi-contract theory of recovery," and the claim must be dismissed.  (Id. (quoting Griffith v. Tiktok, Inc., 2023 WL 9019035, at *6 (C.D. Cal. Dec. 13, 2023).)

As discussed above, Plaintiffs only conclusory allege that their private information lost value; the SAC offers no facts explaining what economic value the information held *for the Plaintiffs* and how it was lost through Defendant's dissemination.  See Low, 900 F.Supp.2d at 1032.  Plaintiffs therefore fail to adequately allege that Defendant "unjustly retained a benefit at the plaintiff's expense."  Katz-Lacabe v. Oracle Am., Inc., 668 F. Supp. 3d 928, 945 (N.D. Cal. 2023).  However, "California law recognizes a right to disgorgement of profits resulting from unjust enrichment, even where an individual has not suffered a corresponding loss."  In re Facebook, Inc. Internet Tracking Litig., 956 F.3d 589, 599 (9th Cir. 2020).  So, although the specificity with which Plaintiffs plead their loss of value allegations matters with respect to their negligence claims, Plaintiffs' allegations need not be as specific for their unjust enrichment claims.  Indeed, for the latter claims, the Ninth Circuit has instructed that it does not matter "whether a defendant's actions caused a plaintiff to directly expend his or her own financial resources or whether a defendant's actions directly caused the plaintiff's property to become less valuable."  Id. at 600.  Instead, all that matters is that Plaintiffs "allege they retain a stake in the profits garnered from their personal browsing histories because the circumstances are such that, as between the two [parties], it is unjust for [Defendant] to retain it."  Id. (internal quotations and citations omitted).  The SAC easily meets that standard.  Plaintiffs allege that their data has financial value and Defendant received a financial benefit from disclosing their data without Plaintiffs' consent.  (See SAC ¶¶ 159–75.)  Plaintiffs also allege that Defendant used the Meta Pixel tool to enhance advertising services and utilize cost-effective marketing to increase Defendant's own profits.  (Id. ¶¶ 10, 156–58.)  These allegations demonstrate that Defendant unjustly benefited by its collection and use of Plaintiffs' information without consent or compensation.  The Court therefore **DENIES** Defendant's Motion to Dismiss Plaintiffs' unjust enrichment claim.

### D.    Claims Four and Five: ECPA and CIPA

An ECPA claim requires a showing that the defendant (1) intentionally (2) intercepted, endeavored to intercept or procured another person to intercept or endeavor to intercept (3) the contents of (4) an electronic communication, (5) using a device.  18 U.S.C. §§ 2510 et seq.  Similarly, CIPA prohibits any person from using electronic means to "learn the contents or meaning" of any "communication" "without consent" or in an "unauthorized manner." Cal. Pen. Code § 631(a).  Under both the ECPA and CIPA, "[i]t shall not be unlawful ... for a person ... to intercept a[n] electronic communication where such person is a party to the

communication," so long as such interception is not "for the purpose of committing any criminal or tortious act" ("party exemption").  18 U.S.C. § 2511(2)(d); <u>see</u> <u>In re Facebook, Inc. Internet Tracking Litigation</u>, 956 F.3d 589, 607 (9th Cir. 2020) ("Both [the ECPA and CIPA] contain an exemption from liability for a person who is a 'party' to the communication, whether acting under the color of law or not.")  "Courts perform the same analysis for both the [ECPA] and CIPA regarding the party exemption." <u>In re Facebook</u>, 956 F.3d at 607.

Here, Defendant argues that they were a party to (and intended recipient of) Plaintiffs' alleged communications on the website.  (Motion at 16–17.)  It is clear from the SAC that Defendant was a party to Plaintiffs' website communications, and Plaintiffs do not dispute this contention.  (<u>See</u> SAC.)  Because Defendant was the party that was meant to, and did, receive Plaintiffs' communications on the website, under the party exemption, "any alleged interception of the communications is not actionable." <u>Pena v. GameStop, Inc.</u>, 2023 WL 3170047, at *3 (S.D. Cal. April 27, 2023).

However, Plaintiffs argue that the party exemption is inapplicable because, as pleaded in the SAC, Defendant's wiretapping was conducted with criminal and/or tortious intent, and thus falls under an exception to the party exemption.  (Opposition at 15–18 (citing 18 U.S.C. § 2511(2)(d).)  Plaintiffs are correct that under the ECPA "consent is not a defense where the 'communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State.'" <u>Brown v. Google LLC</u>, 525 F. Supp. 3d 1049, 1067 (N.D. Cal. 2021) (quoting 18 U.S.C. § 2511(2)(d)).  To make use of the criminal/tortious intent exception, a plaintiff must plead sufficient facts to support an inference that the offender intercepted the communication for the purpose of a tortious or criminal act that is *independent of* the intentional act of recording or interception itself.  <u>Pena</u>, 2023 WL 3170047, at *5 (citing <u>In re Google Cookie Placement Consumer Privacy Litigation</u>, 806 F.3d 125, 145 (3d Cir. 2015)).

Generally, "[a]lleged interceptions fall within the tort or crime exception only where the primary motivation or a determining factor in the interceptor's actions has been to injure plaintiffs tortiously, ... [and] cannot apply where the interceptor's purpose has plainly not been to perpetuate torts on millions of Internet users, but to make money." <u>In re Google Inc. Gmail Litigation</u>, 2014 WL 1102660, at *18 n.13 (N.D. Cal. Mar. 18, 2014) (internal quotations and bracketing omitted).  But even where a defendant is arguably motivated by monetary gain, the crime-tort exception may nonetheless apply if plaintiffs have adequately alleged that the defendant's conduct violated state law, including state law privacy claims.  <u>See</u> <u>Brown</u>, 525 F. Supp. 3d at 1067 (finding that the crime-tort exception may apply because plaintiffs had "adequately alleged that [defendant's] association of their data with preexisting user profiles violated state law, including CDAFA, intrusion upon seclusion, and invasion of privacy"); <u>In re Meta Pixel Healthcare Litig.</u>, 647 F. Supp. 3d 778, 797 (N.D. Cal. 2022) ("<u>In re Meta Pixel</u>") (finding that because "plaintiffs' tort claims against Meta appear viable," there was "a not-insignificant chance, then, that plaintiffs may be able to show that the crime-tort exception applies").  Here, the Court concludes that Plaintiffs have stated a claim for invasion of privacy.  Accordingly, viewing the allegations in the light most favorable to Plaintiffs, the Court concludes

---

that the SAC pleads Defendant's tortious intent.  <u>See</u> <u>In re Meta Pixel</u>, 647 F. Supp. 3d at 797;
<u>Doe v. Meta Platforms, Inc.</u>, 2023 WL 5837443, at *3 ("What [defendant's] true intent is, what
steps it actually took to prevent receipt of health information, the efficacy of its filtering tools,
and the technological feasibility of implementing other measures to prevent the transfer of health
information, all turn on disputed questions of fact that need development on a full evidentiary
record.").

Defendant separately argues that Plaintiffs' ECPA and CIPA claims fail because the SAC
does not sufficiently plead (1) intent or (2) allege what contents of Plaintiff's communications
were intercepted.  (Motion at 18–19.)  To plead intent, a plaintiff must plead facts showing that
the defendant "acted consciously and deliberately with the goal of intercepting wire
communications."  <u>United States v. Christensen</u>, 828 F.3d 763, 775 (9th Cir. 2015).  Defendant
argues that Plaintiffs' "factual allegations fail to show that Walgreens was even collecting
confidential health data during Plaintiffs' use of the Website, let alone that there was any intent
to disclose such information."  (Motion at 18.)  For the reasons set forth above, the Court
disagrees.  Plaintiffs allege that Defendant intentionally utilized tracking technologies to collect,
use, and distribute Plaintiffs' sensitive information to third parties like Facebook.  (SAC ¶¶ 18,
164.)  Plaintiffs specifically allege that Defendant intentionally configured the Pixels to capture
the "characteristics" of users' communications with Defendant's websites, including their IP
addresses and Facebook IDs, as well as the "content" of users' communications, which includes
the links, pages, and tabs users click and view and the search terms they employ.  (<u>Id.</u> ¶ 68.)
These allegations, taken as true and viewed in the light most favorable to Plaintiffs, demonstrate
that Defendant "acted consciously and deliberately with the goal of intercepting wire
communications."  <u>Christensen</u>, 828 F.3d at 775.

Nor is the Court persuaded by Defendant's argument that Plaintiffs have not adequately
plead the "contents" of the information allegedly intercepted by Defendant.  "Under ECPA, the
term 'contents' refers to the intended message conveyed by the communication, and does not
include record information regarding the characteristics of the message that is generated in the
course of the communication."  <u>In re Zynga Priv. Litig.</u>, 750 F.3d 1098, 1106 (9th Cir. 2014).
URLs which disclose search terms that reveal website users' "personal interests, queries, and
habits" are "contents" of communications under CIPA and ECPA.  <u>See</u> <u>Facebook Tracking</u>, 956
F.3d at 605; <u>see also</u> <u>In re Meta Pixel Healthcare Litig.</u>, 647 F. Supp. 3d at 795 (descriptive URLs
are "contents" under the ECPA).  So, too, are search queries such as those for "specialty
healthcare providers and treatments for medical conditions."  <u>Cousin II</u>, 2023 WL 8007350, at
*5.  Here, Plaintiffs allege that the data collected by Defendant and transmitted to third parties
includes personal health information.  Such information reveals a substantive message about
Plaintiffs' health concerns.  <u>See id.</u> (denying motion to dismiss CIPA claim where "Plaintiffs
allege that their data included personal search queries—such as specialty healthcare providers
and treatments for medical conditions—and therefore plausibly conveyed content: their PHI.").
Although not every piece of information allegedly collected and transmitted by Defendant can be
construed as "contents" for the purpose of these statutes (e.g., not "every click or activity" on
the website will suffice, <u>see</u> SAC ¶¶ 68–75), Plaintiffs have adequately alleged contents at this

---

stage.  Accordingly, the Court **DENIES** Defendant's Motion with respect to claims four and five.

### E.   Claims Six, Seven, and Eight: UCL and CLRA

Defendant moves to dismiss claims six through eight (Plaintiff R.C.'s UCL and CLRA claims), arguing that they fail because "Plaintiff does not and cannot allege that she suffered an injury in fact (i.e., an actual economic loss or injury), which is required under both statutes." (Motion at 20.)

The CLRA prohibits "unfair or deceptive acts or practices" in transactions for the sale or lease of goods or services to consumers.  Cal. Civ. Code § 1770(a).  Unlawful practices include "[r]epresenting that goods or services have . . . characteristics . . . uses, benefits, or quantities that they do not have" and "[r]epresenting that goods or services are of a particular standard, quality, or grade . . . if they are of another."  Id. § 1770(a)(5), (a)(7).  Similarly, the UCL prohibits "any unlawful, unfair or fraudulent business act or practice."  Cal. Bus. & Prof. Code § 17200.  Because the statute is written in the disjunctive, the UCL allows for separate theories of liability under the "unlawful," "unfair," and "fraudulent" prongs.  See Hodson v. Mars, Inc., 891 F.3d 857, 865 (9th Cir. 2018); Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co., 973 P.2d 527, 540 (Cal. 1999).  Fraudulent omissions are actionable under both the CLRA and the UCL.  See Daniel v. Ford Motor Co., 806 F.3d 1217, 1225 (9th Cir. 2015).  To be actionable, an omission must be "contrary to a representation actually made by the defendant, or an omission of a fact the defendant was obliged to disclose."  Hodsdon, 891 F.3d at 865 (quoting Daugherty v. Am. Honda Motor Co., 51 Cal. Rptr. 3d 118, 126 (2006)).

UCL and CLRA claims may only be brought by "a person who has suffered injury in fact and has lost money or property as a result of the unfair competition."  Cal. Bus. & Prof. Code § 17204.  Plaintiffs, therefore, must "demonstrate some form of economic injury," such as surrendering more or acquiring less in a transaction, having a present or future property interest diminished, being deprived of money or property, or entering a transaction costing money or property that would otherwise have been unnecessary.  Kwikset Corp. v. Superior Court, 120 Cal. Rptr. 3d 741 (2011); see also VinluanJularbal v. Redbubble, Inc., 2021 WL 4286539, at *3 (E.D. Cal. Sept. 21, 2021) (plaintiff must "establish a loss of deprivation of money or property sufficient to qualify as injury in fact, i.e., economic injury") (quotations and citation omitted).

Plaintiffs argue that they have sufficiently alleged an injury in fact based on (1) loss of benefit of the bargain and (2) diminution in value of their PHI.  (Opposition at 21; see SAC ¶¶ 24, 36, 159-65, 185, 194, 249, 257-63, 386.)  They also argue that they were harmed when their information was "wrongfully divulged and misused (including for marketing and retargeting without consent)."  (Opposition at 21; see SAC ¶¶ 104, 157-58, 249.)

Plaintiffs' benefit of the bargain argument fails because they do not adequately allege that they have paid money or property "in exchange for a product or service, and [have] not received what [they] bargained for."  See Winzig v. Stockpile Investments, Inc., 2021 WL 4812956, at *4

---

(C.D. Cal. July 2, 2021).  Plaintiffs purchased a diabetes test kit and Monistat.  Though they allege that if they were aware their information would be disclosed, they "would not have used Defendant's services or would have paid considerably less for those services," SAC ¶¶ 350, 379, such allegations are conclusory and unattenuated to the other facts alleged.  For example, in In re Anthem, Inc. Data Breach Litig., the case cited by Plaintiffs, it was alleged that insurance premiums were paid at least partly for security measures protecting the plaintiffs' private health information, and because the defendant suffered a data breach, plaintiffs did not get the benefit of their bargain with the defendant.  2016 WL 3029783, at *14 (N.D. Cal. May 27, 2016).  Plaintiffs here cannot allege that their purchases of specific products included costs associated with data security.

Plaintiffs' diminution in value argument also fails for the reasons explained above in reference to Plaintiffs' negligence claim.  See Doe v. Meta Platforms, Inc., 2023 WL 5837443, at *15 (N.D. Cal. Sept. 7, 2023); Hart, 526 F. Supp. 3d 592, 603 (N.D. Cal. 2021) ("That the information has external value, but no economic value to plaintiff, cannot serve to establish that plaintiff has personally lost money or property."); see also Low, 900 F. Supp. 2d at 1032.  The Court therefore concludes that Plaintiffs have failed to adequately plead an injury of fact sufficient to support the CLRA and UCL claims.  These claims are thus **DISMISSED WITH LEAVE TO AMEND**.

**F.      Claim Nine: Virginia Consumer Protection Act**

Defendant moves to dismiss Plaintiff T.S.'s claim under the (Virginia Consumer Protection Act "VCPA").  (Motion at 22.)  The VCPA "prohibits, generally, misrepresenting goods or services."  Fravel v. Ford Motor Co., 973 F. Supp. 2d 651, 656 (W.D. Va. 2013) (internal quotations omitted).  "As a claim sounding in fraud, Rule 9(b)'s particularity requirements apply to the VCPA."  Id. (internal quotations omitted).  As such, plaintiffs alleging a VCPA claim are required to "state with particularity the circumstances constituting fraud or mistake, including the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby."  Student A v. Liberty Univ., Inc., 602 F. Supp. 3d 901 (W.D. Va. 2022).  "[T]he VCPA's plain language . . . requires that a VCPA claimant show that he relied on the alleged misrepresentations" made by defendant.  Cooper v. GGGR Investments, LLC, 334 B.R. 179, 189 (E.D. Va. 2005).  Like the CLRA and the UCL, the VCPA requires plaintiffs to plead actual loss to seek damages.  Attias v. CareFirst, Inc., 365 F. Supp. 3d 1, 10–11 (D.D.C. 2019) ("The Virginia Consumer Protection Act also requires a plaintiff to plead actual loss in order to bring a suit for damages under the Act.") (citing Polk v. Crown Auto, Inc., 228 F.3d 541, 543 (4th Cir. 2000)).

As the Court concludes above with respect to the CLRA and UCL claims, Plaintiff T.S. fails to adequately allege actual loss to support her VCPA claim.  See Attias, 365 F. Supp. 3d at 11–12.  The claim is therefore **DISMISSED WITH LEAVE TO AMEND**.

//
//

---

## V.   CONCLUSION

For the above reasons, the Court **ORDERS** as follows:

1.   Defendant's Motion is **GRANTED IN PART**.

2.   Claims two, six, seven, eight, and nine are **DISMISSED WITH LEAVE TO AMEND**.

3.   Plaintiffs may file an amended complaint no later than **May 28, 2024**.

4.   The Court **VACATES** the May 13, 2024 hearing.

**IT IS SO ORDERED.**